# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-1462

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Michael Howard Reed, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

No. 11-1463

_____

Appeals from the United States District Court for the District of North Dakota.

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Gregory Allen Davis, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: October 18, 2011
Filed: February 9, 2012

_____

Before RILEY, Chief Judge, LOKEN and BENTON, Circuit Judges.

_____

LOKEN, Circuit Judge.

Gregory Allen Davis and Michael Howard Reed irrationally believe that their membership in the Little Shell Nation, an unrecognized Indian tribe, means they are not United States citizens subject to the jurisdiction of the federal courts. This belief led them into serious trouble. First, Reed threatened North Dakota District Judge Ralph Erickson because he refused to dismiss federal drug charges against two other Little Shell members. Months later, when District Judge Daniel Hovland denied a motion to dismiss a firearm charge pending against Reed, Davis filed a Uniform Commercial Code (UCC) financing statement listing Judge Hovland and acting United States Attorney Lynn Jordheim as $3.4 million debtors and Davis as the secured party. After a three-day trial, a jury convicted Davis and Reed of conspiring to file and filing false liens against Judge Hovland and Jordheim in violation of 18 U.S.C. § 1521. The jury also convicted Reed of corruptly obstructing justice in violation of 18 U.S.C. § 1503(a), based on his earlier threats. On appeal, Davis argues that the evidence was insufficient to prove a violation of § 1521. Both Davis and Reed argue, for somewhat different reasons, that the district court[1] violated their constitutional rights by allowing them to represent themselves at trial. We affirm.

## I. Sufficiency of the Evidence To Convict Davis

This is apparently the first appeal of a conviction under 18 U.S.C. § 1521, part of the Court Security Improvement Act of 2007. Pub. L. 110-177, § 201(a), 121 Stat. 2536 (2008). The statute provides:

> Whoever files, attempts to file, or conspires to file, in any public record or in any private record which is generally available to the public,

---

[1]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota, who agreed to sit by designation after the District of North Dakota district judges understandably recused.

any false lien or encumbrance against the real or personal property of an individual described in [18 U.S.C.] section 1114, on account of the performance of official duties by that individual, knowing or having reason to know that such lien or encumbrance is false or contains any materially false, fictitious, or fraudulent statement or representation, shall be fined under this title or imprisoned for not more than 10 years, or both.

Its legislative history explains that the statute is "intended to penalize individuals who seek to intimidate and harass Federal judges and employees by filing false liens against their real and personal property." H.R. Rep. No. 110-218, pt. 1, at 17 (2007), 2007 WL 2199736 at *17.

Reed and Davis conducted a recorded telephone conversation on January 5, 2010, the day Judge Hovland issued an order denying Reed's motion to dismiss the pending firearms charge. The two discussed placing UCC liens for $2.4 million in cash and $1 million in silver against federal entities. The next day, Davis electronically filed a Form UCC-1 financing statement with the Recorder of Deeds in Washington, D.C., listing as debtors, "1. U.S. District Court of North Dakota/Daniel Hovland," and "2. Acting United States Attorney, Lynn C. Jordheim." The filing immediately became a public record because the Recorder of Deeds office accepts electronically filed statements without review.

At trial, an FBI agent testified that, during a January 20 interview, Davis admitted to filing this lien, threatened to file more liens, and referred to the statute prohibiting false liens as "ass wipe." Testifying in his own defense at trial, Davis asserted a right to file the liens against Judge Hovland and Jordheim and stated that the liens had "monetary value," but denied that the liens were intended to harm, or in fact harmed, Judge Hovland and Jordheim. The government's evidence included a May 5, 2010, "Notice of Default" that Reed filed with the District of North Dakota Clerk of Court demanding payment of $3.4 million and referencing the ten-digit

number assigned by the Recorder of Deeds to the financing statement filed by Davis. When asked during cross-examination, "What do you believe [Judge Hovland and Jordheim] owe you or Mr. Reed," Davis replied, "Well, they owe me Mr. Reed. They took Mr. Reed from us on their sovereign jurisdiction. We want him back." Judge Hovland and Jordheim testified that they are not indebted to Davis.

Not challenging this formidable evidence that he knowingly filed a false or fictitious lien against Judge Hovland and U.S. Attorney Jordheim in a public record and on account of their performance of duties in a pending case, Davis argues that the government nonetheless failed to prove that he violated 18 U.S.C. § 1521 because the UCC-1 financing statement listed no "real or personal property of" Judge Hovland or Jordheim as collateral. This insufficiency contention requires us to discern what types of false or fictitious filings Congress intended to prohibit by the term "lien or encumbrance against the real or personal property of" an individual government official. "When a sufficiency argument hinges on the interpretation of a statute, we review the district court's statutory interpretation de novo." United States v. Gentry, 555 F.3d 659, 664 (8th Cir. 2009). We of course assume that Congress intended to adopt the plain meaning or common understanding of the words used in a statute. See United States v. Idriss, 436 F.3d 946, 949 (8th Cir. 2006).

The words "lien" and "encumbrance," though encompassing a wide variety of commercial and financial devices, have a universally accepted meaning in this country. A lien is a property right, usually a legal right or interest that a creditor has in a debtor's property, whether perfected or merely claimed. See, e.g., Permanent Mission of India to the United Nations v. City of New York, 551 U.S. 193, 198 (2007); Mead v. Mead, 974 F.2d 990, 992 (8th Cir. 1992), quoting 11 U.S.C. § 101(37); S.E.C. v. Credit Bancorp., Ltd., 297 F.3d 127, 138 (2d Cir. 2002); Black's Law Dictionary 941 (8th ed. 2004). Likewise, an encumbrance is a claim or liability that attaches to property, usually though not always real property. Permanent Mission, 551 U.S. at 198; Black's, supra, at 568; UCC § 9-102(32). The act of filing

-4-

does not create the lien or encumbrance. Rather, filing is a method, often the exclusive method, of *perfecting* a lien claim against the rights of those who assert competing claims against the property. See, e.g., UCC § 9-310(a). This confirms that Congress limited the prohibition in § 1521 to financial harassment -- filings that harass by claiming rights to the property of public officials -- not to all types of false public filings that might harass public agencies or officials in other ways. Thus, if Davis had filed his lien against the District of North Dakota, without naming Judge Hovland and Jordheim as "debtors," he might or might not have committed some other offense, but he would not have violated § 1521.

Most liens are created by a contract between the debtor and a creditor, such as a security agreement. Some arise by operation of law, such as a materialman's lien or a federal tax lien. See, e.g., 26 U.S.C. § 6321. Filing requirements to perfect a lien are prescribed by statute and vary with the type of lien. We deal here with a filing under the UCC, which has been adopted with minor variations by every State. The UCC governs the creation, attachment, and perfection of "security interests," which are contractual "liens" within the meaning of 18 U.S.C. § 1521. See UCC §§ 9-102(72)(A), 9-201(a), 9-203(a), 9-301. Under the UCC, most security interests are perfected by the filing of a financing statement, typically a Form UCC-1. § 9-310(a). The financing statement is "sufficient" if it names the debtor, names the secured party (creditor) or a representative, and "indicates the collateral covered." § 9-502. An indication that the collateral "covers all assets or all personal property" is sufficient. § 9-504. A financing statement is filed when it is accepted by the filing office. § 9-516(a). Davis's financing statement was accepted without substantive review.

The financing statement filed by Davis, which he testified was a "lien," identified Judge Hovland and Jordheim as debtors. Davis filed the statement with the D.C. Recorder of Deeds. Normally, the UCC provides, a financing statement is filed in the State where an individual debtor resides, here, North Dakota. See §§ 9-301(1), 9-307(b)(1), 9-501(a). But the UCC also provides that the District of Columbia is a

-5-

default debtor location.  § 9-307(c).  Moreover, § 9-307(h) provides, "The United States is located in the District of Columbia," and the first debtor named in Davis's financing statement was a United States District Court.  Thus, Davis chose a filing office whose public records would likely be searched by a party looking for adverse claims against the properties of Judge Hovland and Jordheim, such as prospective lenders, credit card issuers, and credit rating agencies.  He also filed the facially suspect statement electronically and it became a public record without review.

The issue raised by Davis on appeal focuses on the incoherent "collateral" section of his Form UCC-1 financing statement.  To frame the issue, we set forth nearly all of this lengthy portion of the statement:

> 4. This Financing Statement covers the following collateral:
>
> Accepted for full value alleged court case #4-09-cr-00076-DLH [Reed's pending prosecution], United States District Court for the District of North Dakota; . . . Michael Howard Reed . . . Private Discharging and Indemnity Bond number 77915985385;[2] Timothy Geithner, Secretary of the U.S. Treasury; [then listed as "acting agents" are the U.S. Attorney General; the Department of Justice; the North Dakota Governor and Attorney General; three criminal investigators; all District of North Dakota district and magistrate judges; the District Court Clerk; Jordheim and an Assistant U.S. Attorney; and an Assistant Federal Public Defender]; HACTC Detention Center . . . Rugby, North Dakota . . . Jurat Affidavit of Obligation, Affidavit and Affirmation of the Facts.  This UCC lien in this instant action is $2,400,100.00 USD for default of court case # 4-09-cr-00076-DLH and $1,000,000.00 (million) in sliver [sic] coinage for copyright violations of MICHAEL HOWARD REED TM [no doubt meaning trademark].
>
> The adjustment of this filing is from Public Policy and UCC 1-104.  All proceeds, products, accounts and fixtures including order(s) wherefrom are released to the debtor. . . . The Secured Party stands by the Treaty of 1778, 1863, The Declaration of Princess Anne 1704 In regards to Mohegan Indians v Connecticut, The Royal Proclamation of King George 1763, Declaratory Judgment < 28 USC 201>; Esens=Little Shell occupants of the land.

---

[2]Davis testified at trial and asserts on appeal that this listing of an otherwise unexplained indemnity bond demonstrated his intent to protect, not harm, the listed debtors.  If even plausible, that was of course for the jury to decide.

Davis argues the government failed to prove a violation of § 1521 because this statement did not identify -- or, in UCC parlance, "indicate" -- any "property of" Judge Hovland and Jordheim as collateral. But a lien or encumbrance by definition always concerns the property of the debtor, so we question whether the evidence would be insufficient as a matter of law on this ground if the government proved that a false or fictitious lien was actually filed in a public record and proved the other elements of § 1521 beyond a reasonable doubt.[3] We need not decide that question in this case because we conclude that a reasonable jury could find based on the collateral section of Davis's financing statement that he filed a lien against the property of Judge Hovland and Jordheim and therefore violated § 1521:

First, Davis's long narrative reciting the collateral covered by the financing statement began by naming a pending District of North Dakota case being prosecuted by Jordheim's office before Judge Hovland, sufficient evidence that the lien was filed "on account of the performance of [their] official duties." Second, the description identified an "Obligation" --  a debt -- and then recited the amount owed, $3.4 million. Next, the description named types of personal property against which valid liens can be filed -- "sliver [sic] coinage" and "proceeds, products, accounts and fixtures." Finally, the description named, not a typical security agreement, but ancient treaties, declarations, and proclamations, the types of legal documents out of which liens could arise as a matter of law.

The lien was actually filed and became a public record. From the perspective of third parties searching this public record for claims that might lessen the debtors' interests in their properties, the lengthy description of collateral, however incoherent,

---

[3]Some States have amended UCC Article 9 to give filing officers discretion to refuse apparently fraudulent or unauthorized filings and to streamline procedures for the removal of fraudulent filings. See White & Summers, Uniform Commercial Code § 31-16 (6th ed. 2010). Absent such an amendment, the UCC grants little authority to refuse to accept fraudulent filings. See § 9-520(a) & cmt. 2.

was likely to cause the financial harassment intended. No doubt the filing would not have succeeded in perfecting a priority claim to any property as a matter of commercial law. But that is not a defense. The prohibition in 18 U.S.C. § 1521 is triggered by the filing of a false or fictitious lien, whether or not it effectively impairs the government official's property rights and interests. Indeed, legal insufficiency is in the nature of the false, fictitious, and fraudulent liens and encumbrances that Congress intended to proscribe. Therefore, viewing the evidence in the light most favorable to the jury's verdict and drawing all reasonable inferences supporting it, the evidence was sufficient to convict Davis of violating 18 U.S.C. § 1521. United States v. Ewing, 632 F.3d 412, 415 (8th Cir. 2011) (standard of review).

## II. Self-Representation

At their separate arraignment hearings, Davis and Reed were uncooperative, often belligerent. Reed covered his ears while the charges were read and threatened to fire any standby counsel who might be appointed. Davis frequently interrupted the proceedings, demanding that the magistrate judge present her "oath of office" and insisting the court had no jurisdiction over him. Davis, too, refused court-appointed counsel: "I don't want to see a lawyer. If you do, I'm going to lien him down fast." Given their rejection of court-appointed counsel, the magistrate judge[4] assigned Reed and Davis standby counsel.

Prior to trial, in granting a continuance, the district court noted that "[n]either defendant has demonstrated an ability to understand and articulate the correct law applicable to their defense." Two days later, the court wrote standby counsel, noting the magistrate judge had protected defendants' constitutional rights and instructing counsel to make sure their clients understood the dangers of self-representation. To

---

[4]The Honorable Alice R. Senechal, United States Magistrate Judge for the District of North Dakota.

that end, Judge Kornmann enclosed and instructed counsel to distribute to Davis and Reed a two-page document containing a lengthy series of questions explaining the complex tasks a defense lawyer performs at trial and illustrating why "a common maxim is that a lawyer who represents himself has a fool for a client."

Davis and Reed nonetheless insisted on representing themselves at trial; they provided opening statements, cross-examined the government's witnesses, testified in their own defense, and offered a mountain of irrelevant documents relating to their claims of personal sovereignty. Standby counsel were present throughout the trial and participated in some matters, such as arguing evidentiary issues, with defendants' approval. On appeal, Reed and Davis seek to overturn their convictions on the ground that the district court erred by allowing them to exercise their constitutional right of self-representation. Neither claims a mental illness or legal incompetency. As the government notes, the contrary approach urged on appeal -- forcing attorneys on unwilling, belligerent criminal defendants -- "would have made a volatile trial situation much worse."

**A.** Davis argues the district court erred in concluding that he knowingly and voluntarily waived his right to counsel. Before allowing a defendant to represent himself, a district court "must be satisfied that his waiver of appointed counsel is knowing and voluntary." United States v. Patterson, 140 F.3d 767, 774 (8th Cir.), cert. denied, 119 S. Ct. 245 (1998). We review the waiver determination *de novo* and affirm "if the record shows either that the court adequately warned him or that, under all the circumstances, he knew and understood the dangers and disadvantages of self representation." United States v. Kind, 194 F.3d 900, 903-04 (8th Cir. 1999) (quotation omitted), cert. denied, 528 U.S. 1180 (2000).

The pretrial and trial record demonstrate that Davis made a knowing and voluntary waiver of his right to counsel after being repeatedly warned of the dangers and disadvantages of doing so. The court provided Davis standby counsel. He

allowed standby counsel to advise him during trial and to conduct some tasks where a lawyer's skills were needed, such as closing argument and jury instructions, while Davis maintained control over the examination of witnesses and the introduction of defense evidence. Compare Patterson, 140 F.3d at 775.

Citing Indiana v. Edwards, 554 U.S. 164 (2008), Davis argues the district court should have denied him the right of self-representation because it was apparent he would be "unable and/or unwilling to follow the rules of the court" or acknowledge the court's jurisdiction. Reed makes the same argument. But Edwards simply held that a State may insist on counsel for defendants whose "severe mental illness" makes them "not competent to conduct trial proceedings by themselves." Id. at 177-78. Edwards did not alter a fundamental premise of the constitutional right of self-representation -- "a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'" Faretta v. California, 422 U.S. 806, 834 n.46 (1975); see Godinez v. Moran, 509 U.S. 389, 399-400 (1993); United States v. Berry, 565 F.3d 385, 391 (7th Cir. 2009). Like the unwise defendants in United States v. Johnson, 610 F.3d 1138, 1140 (9th Cir. 2010), Davis and Reed "had the right to represent themselves and go down in flames if they wished, a right the district court was required to respect." Having given the appropriate warnings and determined that the waiver of counsel was knowing and voluntary, the district court properly allowed Davis and Reed to exercise their constitutional right of self-representation.

**B.** In addition to arguing he should not have been allowed to defend himself foolishly, Reed raises an additional issue. His conduct demonstrated a lack of rational understanding of the law and the proceedings, he argues, and therefore the district court erred by failing to determine whether he was legally competent to knowingly and intelligently waive his right to counsel. A defendant seeking to waive his right to counsel must be competent to do so. However, "a competency

-10-

determination is necessary only when a court has reason to doubt the defendant's competence." Godinez, 509 U.S. at 401 n.13.

"Whether a competency evaluation is warranted is a determination within the discretion of the district court." United States v. Crawford, 487 F.3d 1101, 1105 (8th Cir.), cert. denied, 128 S. Ct. 709 (2007). The district court is in the best position to assess competency. United States v. Turner, 644 F.3d 713, 723 (8th Cir. 2011), citing Edwards, 554 U.S. at 177. In United States v. Washington, we cited three factors that supported the district court's decision not to order a formal competency evaluation before allowing the defendant to represent himself: (i) no party or attorney requested an evaluation; (ii) the court's direct observation of the defendant did not suggest need for an evaluation; and (iii) the court "specifically concluded [the defendant] was competent." 596 F.3d 929, 941 (8th Cir.), cert. denied, 131 S. Ct. 336 (2010). In addition, the defendant in Washington "did not show, and has not shown, that he suffered from any sort of mental illness or incapacity." Id.

Applying these Washington factors to the record in this case, we conclude the district court did not abuse its discretion. Neither Reed, his standby counsel, nor the government requested a competency evaluation. The district court had ample opportunity over the course of the trial proceedings to observe and evaluate Reed's competence. At Reed's arraignment, the magistrate judge declared, "given Mr. Reed's earlier statements, the Court is confident that Mr. Reed understands the charges." In his pretrial order granting a continuance, Judge Kornmann noted defendants' failure to "understand and articulate the correct law applicable to their defense." But the competence required "is the competence to *waive the right*, not the competence to represent himself." Godinez, 509 U.S. at 399. At the start of trial, before jury selection, Reed's lengthy colloquies with the court demonstrated that he was committed to pursuing untenable defenses, but not that he lacked the mental competence to stand trial and to knowingly waive his right to counsel. Although the court made no specific finding of competence, the record reflects both the court's on-

going efforts to protect Reed's right to a fair trial, and the lack of any objective sign that Reed was not competent to waive his right to counsel.   Finally, Reed does not argue that he suffers from the kind of severe mental illness at issue in Edwards.  See United States v. Posadas-Aguilera, 336 F. App'x 970, 976 & n.5 (11th Cir. 2009).

For the foregoing reasons, the judgments of the district court are affirmed.

_____