**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

DENARD DARNELL NEAL, AKA
Denard Darnell of the Family Neal,
*Defendant-Appellant*.

No. 12-10454

D.C. No.
1:11-cr-00297-
LJO-1

OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, District Judge, Presiding

Argued and Submitted
October 6, 2014—San Francisco, California

Filed January 12, 2015

Before: Sandra S. Ikuta, N. Randy Smith,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge N.R. Smith

## SUMMARY[*]

### Criminal Law

The panel affirmed a conviction and sentence for fourteen counts of attempting to file false liens and encumbrances against the real or personal property of officers and employees of the United States Penitentiary, Atwater, in violation of 18 U.S.C. § 1521.

The panel held that the prohibition in § 1521 is triggered by the filing, attempting to file, or conspiring to file a false or fictitious lien, without regard to the validity or existence of the collateral identified in the document; and that on plain error review, the conviction was supported by sufficient evidence.

The panel held that the district court did not commit plain error in failing to hold a competency hearing sua sponte before allowing the defendant to represent himself at all stages of the proceedings.

The panel held that the district court did not commit plain error in applying a two-level enhancement pursuant to U.S.S.G. § 2A6.1(b)(2)(B) for multiple liens against multiple victims; and that because the § 2A6.1(b)(2)(B) enhancement and the grouping guideline, U.S.S.G. § 3D1.4, serve distinct purposes, the Sentencing Commission authorized and intended the cumulative application of both provisions.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the district court did not plainly err in imposing the sentence, despite the fact that the presentence report inaccurately described the length of the defendant's prior sentences.

## COUNSEL

John Paul Balazs (argued), Sacramento, California, for Defendant-Appellant.

Jared C. Dolan (argued) and Michael G. Tierney, Assistant United States Attorneys, Sacramento, California, for Plaintiff-Appellee.

## OPINION

N.R. SMITH, Circuit Judge:

A defendant violates 18 U.S.C. § 1521 when the defendant files, attempts to file, or conspires to file a false document of the sort regularly used to create liens or encumbrances against the real or personal property of a United States officer or employee. The prohibition is triggered by filing, attempting to file, or conspiring to file a false or fictitious lien, whether or not the described collateral sought to be liened or encumbered in the document is in fact real or personal property.

Additionally, we find the district court did not commit plain error in (a) allowing Defendant-Appellant Denard Neal to represent himself throughout these proceedings; (b) applying the two-level enhancement described in United

States Sentencing Guidelines Manual ("USSG")
§ 2A6.1(b)(2)(B) to Neal's sentence; and (c) imposing 87-
months' imprisonment on each of the fourteen counts (to be
served concurrently with each other, but consecutively to any
unserved prior term of imprisonment), though the presentence
report inaccurately described the length of Neal's prior
sentences.

**A. Background**

In 2010, Neal was serving a sentence for armed robbery
in the United States Penitentiary, Atwater ("USP-Atwater")
in Merced County. While processing another prisoner for
release from the penitentiary, USP-Atwater guards discovered
a package that Neal had given the prisoner to mail for Neal
once released. Upon inspecting Neal's package, the guards
discovered various handwritten documents. Four of the
documents were titled "Security Agreement Commercial
Lien," identifying Neal as the secured party and fourteen
USP-Atwater employees as debtors. Each Security
Agreement was accompanied by a standardized Uniform
Commercial Code ("UCC") Financing Statement ("UCC-1").[1]
The Security Agreements and UCC-1 Financing Statements
("Lien Documents") indicated that the identified USP-
Atwater employees owed Neal amounts ranging from five
thousand to forty-five million dollars, arising from their
alleged criminal activities that caused Neal harm. Each Lien
Document listed collateral for the lien as the employee's
"oath of offices and all collateral related to the bonds that

---

[1] A UCC-1 financing statement is a standardized legal form filed by a
creditor giving notice of an interest in the personal property of a debtor (a
person who owes a debt to the creditor as typically specified in the
agreement creating the debt).

support, endorse the oath of offices." According to the Lien Documents, the "liens were to remain in place for 100 years," or until Neal was paid in full.

Included with the Lien Documents was a cover letter from Neal to his mother. In the letter, Neal asked his mother to type the documents. Neal also gave his mother step-by-step instructions for correctly filing the documents with the California Secretary of State and the County Recorder in Merced County on his behalf. Neal advised his mother that the "value of each oath of office [could] be found in the Security Agreement and matching UCC-1." Neal wanted his mother to act quickly. Once the documents were filed, Neal wanted to "present the documents to the Department of Justice and get [the USP-Atwater employees] fired."

Lastly, a letter addressed to Deputy Assistant Attorney General Daniel Koffsky was included in the packet. The letter claimed to provide "Actual and Constructive Notice" that Neal had "filed and registered the enclosed government officials['] Oath of Offices with the [California] Secretary of State."

After discovering Neal's Lien Documents, the FBI interviewed Neal about his attempt to file liens against the USP-Atwater employees. In the interview, Neal affirmed he wrote the documents. Neal told the agent the fourteen USP-Atwater employees had committed crimes against him. Because of their crimes, Neal concluded the employees should be fired and should also monetarily compensate him. As a result of the information obtained in the interview and in Neal's packet, Neal was charged with fourteen counts of attempting to file false liens and encumbrances against the

real or personal property of fourteen officers and employees of USP-Atwater, in violation of 18 U.S.C. § 1521.

At Neal's arraignment and plea hearing, Neal informed the court that he wanted to represent himself. In response, the court immediately conducted a *Faretta* hearing. The court informed Neal of: (1) the nature of the charges against him; (2) the possible penalties; and (3) the dangers and disadvantages of self-representation. During the hearing, Neal frequently engaged in lengthy back-and-forth dialogue in response to the court's questions. Neal affirmed that he understood the charges against him and the possible penalties. Neal also respectfully disagreed with the court's admonishment that Neal would be better off represented by counsel. Neal reasoned he was better off without a lawyer, because lawyers did not have a very high success rate. Neal also stated that no one "fights for yourself like you do." Neal's adamant desire to represent himself did not diminish during the hearing. At the conclusion of the hearing, the court found Neal wanted to represent himself and that Neal had knowingly and voluntarily waived his right to counsel.

Before trial, Neal filed numerous motions. In many of Neal's filings, Neal disputed the court's jurisdiction, asserting the "United States [was] a corporation." The court denied most of Neal's motions as frivolous and nonsensical.

At trial, Neal's Lien Documents were presented as exhibits and entered into evidence. Neal did not dispute that he created and attempted to file the Lien Documents. Instead, Neal argued his liens were not criminal, because USP-Atwater employees had engaged in various criminal activities causing him personal harm and losses. Neal also argued his liens did not violate the statute, because the collateral he

identified (oath of offices and all collateral related to the bonds that support or endorse the oath of offices) was owned by the American people, not a USP-Atwater employee.  Neal even encouraged the jury to look at the Lien Documents, stating the jury would agree the documents "[do] not mention any real property."  Neal argued that his Lien Documents "plac[ed] a value on the oath of office, not on the debtor."  Neal encouraged the jury to ignore the government's expert witness "[b]ecause [the expert] couldn't read or understand" his Lien Documents.  Neal argued the real reason he was being prosecuted was "because [he] came up with a concept to remove government officials from their office when they commit criminal activity," not for "fil[ing] liens against government officials."

The government argued Neal's Lien Documents were precisely the type of documents prohibited by the statute. The government explained Neal's documents were of the sort regularly used to create liens and encumbrances against property.  According to the government, Neal's motivation was retaliation.  Neal's Lien Documents accused the employees of engaging in a litany of criminal actions (trespass, theft, fraud, "aiding and abetting, and numerous criminal torts, acts constituting treason and sedition against the Life, Liberty, private property, birthright and happiness of our Master Secured Party/Creditor Denard-Darnell Neal"), allegedly resulting in personal harm to Neal.  In the Lien Documents, Neal also claimed each USP-Atwater employee admitted committing the various criminal offenses against him while they were employed at USP-Atwater.  "I [USP-Atwater employee] do freely admit and affirm without reservation . . . [regarding] the above state acts . . . [I] acted with intent . . . [and] did commit . . . criminal acts . . . ." Further, the liens declared that each USP-Atwater employee

agreed to the imposition of Neal's liens. "I [USP Atwater employee] . . . accept and agree that this . . . Common Law Lien is Binding Upon ALL OATH OF OFFICES AND ALL COLLATERAL RELATED TO THE BONDS THAT SUPPORT, ENDORSE THE OATH OF OFFICES."

As shown in Neal's Lien Documents, Neal's collateral was not limited to the employee's oath of office. The collateral also included all bonds that supported and endorsed the oaths of office. The government's expert witness testified that, despite the falsity and technical deficiencies of Neal's documents, they would likely be accepted and filed. Once filed, the alleged debtors would bear the burden of proving the documents false and having the liens removed.

After the two-day jury trial, Neal was convicted on all fourteen counts. The district court sentenced Neal to 87-months' imprisonment on each of the fourteen counts, to be served concurrently with each other but consecutively to any prior, undischarged term of imprisonment. Neal filed a timely appeal.

Neal appeals (1) the sufficiency of the evidence. Neal argues the evidence was insufficient to support his conviction, because the collateral he identified (oath of offices and all collateral related to the bonds that support or endorse the oath of offices) is not the *real or personal property* of a federal officer or employee. Neal appeals (2) his waiver of counsel, claiming he was incompetent. Neal argues it was error for the court to allow him to represent himself throughout the proceedings without holding a competency hearing. Neal also appeals (3) his sentence. Neal argues the application of a two-level, multiple-lien enhancement to his sentence resulted in impermissible double

counting.  Finally, Neal appeals (4) the length of his sentence. Neal argues the district court may have imposed a different sentence if his presentence report had correctly reported the length of his previous sentences.

## B. Discussion

### 1. On plain error review, Neal's conviction was supported by sufficient evidence.

Neal argues that there was insufficient evidence to support his conviction.  Specifically, Neal argues there was no evidence that the collateral he attempted to attach (oath of offices and all collateral related to the bonds that support or endorse the oath of offices) was real or personal property of a federal employee as required by the statute.  Neal does not argue what type of property his collateral is; he simply insists that it is *not* real or personal property.  Generally, we would review Neal's challenge to the sufficiency of the evidence under the standard announced in *Jackson v. Virginia*, determining "whether, after viewing the evidence in the light most favorable to the [government], *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  443 U.S. 307, 319 (1979) (emphasis in original).  However, our task here is further complicated by Neal's failure to raise the issue in the district court, requiring us to review only for plain error or to prevent a manifest miscarriage of justice.  *See United States v. Kuball*, 976 F.2d 529, 531 (9th Cir. 1992).

To succeed on plain error review, Neal "must show (1) an error, (2) that is plain, (3) that affects substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *United States v. Zalapa*,

509 F.3d 1060, 1064 (9th Cir. 2007) (internal quotation omitted). "Reversal of a criminal conviction on the basis of plain error is an exceptional remedy . . . ." *United States v. Bustillo*, 789 F.2d 1364, 1367 (9th Cir. 1986). There was no error in this case, much less plain error or a miscarriage of justice. Even under *Jackson*'s less deferential standard of review, there was sufficient evidence to sustain Neal's conviction.

Because Neal's argument regarding the insufficiency of the evidence challenges whether the collateral identified in his liens was real or personal property, we must look to the text of the statute to determine the meaning of "real or personal property." *See United States v. Thompson*, 728 F.3d 1011, 1015 (9th Cir. 2013) (when a sufficiency argument hinges on the interpretation of a statute, we review the district court's statutory interpretation de novo). Specifically, we must review the portion of the statute criminalizing the filing of, the attempted filing, or the conspiring to file "any false lien or encumbrance against the real or personal property" of a federal employee.

18 U.S.C. § 1521 provides:

> Whoever files, attempts to file, or conspires to file, in any public record or in any private record which is generally available to the public, any false lien or encumbrance against the real or personal property of [a U.S. officer or employee], on account of the performance of official duties by that individual, knowing or having reason to know that such lien or encumbrance is false or contains any materially false, fictitious, or fraudulent

> statement or representation, shall be fined under this title or imprisoned for not more than 10 years, or both.

When interpreting a statute, we are guided by the fundamental canons of statutory construction and begin with the statutory text. *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004). We interpret statutory terms in accordance with their ordinary meaning, unless the statute clearly expresses an intention to the contrary. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989). We must "interpret [the] statut[e] as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *Boise Cascade Corp. v. U.S. E.P.A.*, 942 F.2d 1427, 1432 (9th Cir. 1991). Additionally, "[p]articular phrases must be construed in light of the overall purpose and structure of the whole statutory scheme." *United States v. Lewis*, 67 F.3d 225, 228–29 (9th Cir. 1995).

This statute does not define the terms "real or personal property" as used in the statute. Nor does chapter 73 of title 18—in which § 1521 is located—include a definition section for these terms. Similarly, there is no guiding preamble, recital, or purpose clause. The statute's title and heading simply signal that the statute punishes retaliation against federal employees. However, we are able to determine the meaning of the terms "real or personal property," by examining the terms in the context of the surrounding text and examining the statute's scheme and overall purpose.

The statute's overall scheme and purpose seeks to prevent false filing of liens or encumbrances intended to harm a

federal employee. The statute focuses on preventing a specific type of harm. The text of the statute prohibits all persons from using false financial filings to harm and intimidate federal employees. The foreseeable circumstances, determining who may cause the harm and how the harm results, are numerous and varied and seem of limited (if any) importance in the statute.

The statute's surrounding text also assists in interpreting the meaning of "real and personal property" as used in § 1521. The statute's repetition of the indefinite determiner "any" signals an intended broad and expansive application of the statute. *See United States v. Gonzales*, 520 U.S. 1, 5 (1997) (noting the word "any" has expansive meaning, "one or some indiscriminately of whatever kind"). In § 1521, the word "any" modifies *where* an individual is prohibited from filing—in *any public* record or in *any private* record (which is generally available to the public). *See* 18 U.S.C. § 1521. "Any" also modifies *what* is prohibited. The statute prohibits the filing of *any* false liens or encumbrances. *Id*. The statute does not attempt to identify all possible offending documents. *Id*. Rather, the statute prohibits documents of the sort used to create liens or encumbrances. The focus is on preventing the harm such documents may cause, rather than focusing on the actual documents.

We also note that the conduct prohibited by the statute is not confined to completed acts. Rather than requiring that the false lien or encumbrance actually be filed in order to violate the statute, the statute's prohibition is triggered by *filing*, *attempting* to file, or *conspiring* to file a false lien or encumbrance. *See id.* Because the statute can be violated without completed conduct, the harm the statute protects

against arises from the nature of the documents to be filed, not the validity of the documents.

Further, the statute lacks any reference either to technical filing requirements in the statute or to a filer's understanding of technical requirements therein. Again, validity is not a prerequisite for violation. Indeed, the statute criminalizes the filing of, the attempting to file, or the conspiring to file *false* liens or encumbrances, not *false valid* liens or encumbrances. *Id*. Validity inquiries examine inter alia, the sufficiency of the information found in the documents (e.g., correctness and completeness of the debtor's name and address), the timing of the filing, the manner of the filing, the correctness of the listed collateral or its legal description and the sufficiency of supporting documents. The statute makes such validity inquiries irrelevant.

Not only are such validity inquiries irrelevant to determining whether the statute has been violated, they often have little or no impact on whether such documents can or will be filed by the filing authorities. The California Commercial Code, following the UCC, grants little authority to filing offices to refuse to accept fraudulent or invalid filings.[2] *See* Cal. Com. Code §§ 9516(b), 9520(a). Indeed, the filing office is not authorized to determine whether the information in a filing is (or could be) legitimate or valid. *Id.* § 9516, Editors' Note 3. Therefore, the terms "real and personal property" are not intended to limit the scope of the

---

[2] *See* UCC § 9-520(a) & cmt. 2; Cal. Com. Code § 9516. Generally, the bases for rejection are limited to the document missing some requisite information (e.g., debtor's name), the record not being communicated in a manner (e.g., written rather than electronic) that the filing office accepts, or filer failing to tender the required filing fee.

statute, but rather to indicate the class of documents prohibited by the statute. The statute prohibits the filing of, the attempting to file, or the conspiring to file documents of the sort that could create false liens and encumbrances against federal employees. The prohibition is triggered by the type of document and resulting harm without regard to the validity or existence of the identified collateral in such documents. Neal's focus on collateral is misplaced, because the collateral he listed in his Lien Documents is not relevant to whether he violated the statute.

Our reading of the statute is consistent with the general legislative policy behind the enactment of 18 U.S.C. § 1521. "Since 2004, there [was] a nationwide increase in the number of filings by prison inmates of unsubstantiated liens and [UCC] financing statements against state or federal officials involved with their incarceration." *Jones v. Caruso*, 569 F.3d 258, 261 (6th Cir. 2009). Section 1521 was enacted in response to the increasing vulnerability of federal employees as part of the Court Security Improvement Act of 2007.[3] It intends to penalize individuals who seek to intimidate and harass federal employees and officers by filing, attempting to file or conspiring to file false liens or encumbrances. *See* H.R. Rep. 110-218 (2007).

The Eighth Circuit took an analogous view of real or personal property in the first appellate case to interpret § 1521. *See United States v. Reed*, 668 F.3d 978, 984–85 (8th Cir. 2012). Similar to Neal, the defendant in *Reed* argued that "the government failed to prove a violation of § 1521 because [the UCC-1 financing statement] did not . . . [indicate] any property of [a federal employee] as collateral." *Id.* at 984

---

[3] Pub. L. 110–177, § 201(a), 121 Stat. 2534, 2535–36 (2008).

(quotation marks omitted). The *Reed* court acknowledged that Reed's documents were technically deficient, and his "lengthy" and "incoherent" description of collateral in the filings would not have succeeded in perfecting a priority claim under UCC law. *Id.* However, the court stated technical deficiencies were not a defense. *Id*. The *Reed* court affirmed that "[t]he prohibition in 18 U.S.C. § 1521 is triggered by the filing of a false or fictitious lien, whether or not it effectively impairs the government official's property rights and interests." *Id*. at 984–85. "Indeed, legal insufficiency is in the nature of the false, fictitious, and fraudulent liens and encumbrances that Congress intended to proscribe." *Id*. at 985.

We now consider Neal's argument that there was insufficient evidence to support his conviction under § 1521 in light of our interpretation of the terms "real and personal property" in that statute as referring to documents of the sort that could create false liens and encumbrances against federal employees.

Similar to Reed's jury, Neal's jury was presented with undisputed evidence that Neal created and attempted to file standard lien documents bearing common lien language—documents of the sort regularly used to create liens and encumbrances against real or personal property. Neal's Lien Documents clearly identified individual debtors and their corresponding debts. There was no ambiguity as to who owed the debt and why the obligation was being asserted. Contrary to Neal's assertion, the collateral listed was not limited to each employee's oath of office. Neal also attempted to attach all bonds that supported and endorsed the oaths of office.

Evidence was also presented indicating that false, technically deficient, financial documents are routinely accepted by filing offices without regard to the document's accuracy or legitimacy. Once a false lien is filed, the alleged debtor bears the burden of proving the lien's falsity and having it removed.[4]  Evidence demonstrated documents similar to Neal's can encumber property, cloud title, and cause significant harm to innocent persons alleged to be debtors.

The government also presented the letter Neal wrote to his mother.  Neal gave his mother step-by-step instructions for filing the Lien Documents on his behalf.  Neal also told his mother that if he was able to register the "[s]taff['s] oath of offices" under his name, "the [DOJ] will fire them."  It was reasonable for the jury to infer from this evidence that Neal believed if he acquired rights in an employee's oath of office, he could demand payment of the false debt if the employee did not want to risk being fired.  In other words, it was reasonable for the jury to infer that Neal intended to file documents of the sort that could create false liens and encumbrances against federal employees.

There was sufficient evidence for a reasonable juror to find Neal knowingly attempted to file false documents, intending to harass the USP-Atwater employees on account of their performance of official duties.  Congress enacted § 1521 precisely to prevent this type of conduct.  Therefore, the jury's conviction of Neal for violating § 1521 was not plainly erroneous.

---

[4] *See* Cal. Com. Code § 9518.

**2. The district court did not commit plain error in failing to hold a competency hearing sua sponte before allowing Neal to represent himself at all stages of the proceedings.**

Neal argues the district court erred in failing to order a competency hearing sua sponte before allowing him to waive counsel and represent himself at all stages of his proceedings. We review a district court's failure to sua sponte order a competency hearing for plain error. *United States v. Dreyer*, 705 F.3d 951, 960 (9th Cir. 2013). "Failing to sua sponte hold a competency hearing is plain error only if 'the evidence of incompetence was such that a reasonable judge would be expected to experience a genuine doubt respecting the defendant's competence.'" *United States v. Garza*, 751 F.3d 1130, 1134 (9th Cir. 2014) (quoting *Dreyer*, 705 F.3d at 961). Relevant evidence includes medical history, the defendant's behavior in and out of court, and the connection between the defendant's serious mental disease or defect and some failure by the defendant to understand the proceedings, assist in his own defense, or carry out the basic tasks needed to present his own defense without the help of counsel. *See id*. at 1134–35. Absent such evidence, a district court does not plainly err in failing to sua sponte hold a hearing to determine the defendant's competence to stand trial, *see id.*, or to represent himself at trial and sentencing, *see Godinez v. Moran*, 509 U.S. 389, 399–402 (1993).[5]

---

[5] We note that once a district court holds such a hearing, it may determine that the defendant is not competent to represent himself at trial, even if the defendant would be sufficiently competent to stand trial. *See Indiana v. Edwards*, 554 U.S. 164, 178 (2008).

### A. The medical evidence presented to the district court was insufficient to cause a reasonable judge to experience genuine doubt as to Neal's competency to represent himself.

A defendant must present "strong" medical evidence of a serious mental disease or defect before a genuine doubt about competency will arise. *Garza*, 751 F.3d at 1135. Even then, it would not be error for the court to fail to hold a competency hearing unless the defendant also established a causal connection between the mental disease or defect and his inability to understand the proceedings.[6] *Id* at 1136. "Where the defendant's mental problem—even if severe—has no discernible impact on the proceedings, we have not found substantial evidence." *Id*.[7] "Even a mentally deranged defendant is out of luck if there is no indication that he failed to understand or assist in his criminal proceedings." *Id*.[8] "And even if that same defendant did fail to understand or assist in his proceedings, he would still be out of luck unless his mental impairment caused the failure." *Id.*

---

[6] *See, e.g.*, *Davis v. Woodford*, 384 F.3d 628, 645–46 (9th Cir. 2004); *Boag v. Raines*, 769 F.2d 1341, 1343–44 (9th Cir. 1985); *Steinsvik v. Vinzant*, 640 F.2d 949, 952–54 (9th Cir. 1981); *Sailer v. Gunn*, 548 F.2d 271, 274–75 (9th Cir. 1977).

[7] *See also Davis*, 384 F.3d at 645–46; *Steinsvik*, 640 F.2d at 952–54.

[8] *See also Bassett v. McCarthy*, 549 F.2d 616, 617, 619–21 (9th Cir. 1977) (concluding that no genuine doubt as to competency existed even though defendant was deemed schizophrenic, declared insane by two government psychiatrists prior to trial and refused to cooperate with his counsel at trial, because prior to the crime, defendant was a socially capable, average college student).

Neal relies on his presentence report to show he suffered from a severe mental disease or defect. However, Neal's presentence report does not contain sufficient medical evidence to raise a genuine doubt as to Neal's competency. The report referred to Neal's suicide attempts twenty-two years previous. According to the report, around the time of the suicide attempts, Neal believed psychiatrists were attempting to medicate him. However, there are no details about a diagnosis or medications prescribed. The report noted that, even when counseling was required as part of Neal's previous parole, the counselor stated therapy was not recommended.

According to the presentence report, Neal had reported a deterioration in his current mental health, because he realized "people don't follow the truth in his eyes," and that the court had taken a "bias[ed]" position in his case. As a result, Neal had requested therapy to help him deal with the "conflicts in what he described as a flawed system." Neal's request for therapy, to help him deal with his disillusionment with the judicial system, was not sufficient to create serious doubt as to his competency. "Certainly the mere fact that psychiatric help was felt to be desirable . . . cannot be said to create a bona fide doubt of [Neal's] capacity to participate intelligently in the proceedings facing him." *Sailer*, 548 F.2d at 275. "To hold otherwise would reflect disparagingly" on those who are clearly competent, yet require some therapeutic assistance. *Id*. We find the record lacks substantial medical evidence that would lead a reasonable judge to harbor a genuine doubt about Neal's competency.

### B. Neal's conduct in and out of court did not create genuine doubt as to his competency.

Neal argues that, if we find the medical evidence he now emphasizes is insufficient to raise a genuine doubt as to his competency during the proceedings, we should find his courtroom conduct and his many "nonsensical" filings containing "rambling statements" and "irrational arguments" should have raised serious doubt as to his competency. In the past, we have found that if medical evidence fails to establish the existence of a mental disease or defect, bizarre or erratic behavior—especially in court—may raise a genuine doubt as to a defendant's competency. *See Garza*, 751 F.3d at 1135–36.[9] However, competency will not be questioned when a defendant merely displays rude, uncooperative and sometimes wacky behavior. *See United States v. Johnson*, 610 F.3d 1138, 1144, 1146 (9th Cir. 2010) (finding no doubt concerning competency when defendant's courtroom behavior was uncooperative and eccentric, but not significantly disruptive or defiant). Likewise, voluminous filings of nonsensical pleadings do not create per se serious doubt about competency. *See id*.

Reviewing the record, Neal did not manifest any observable signs of incompetency during his proceedings such that a reasonable judge would experience genuine doubt about his competency. The record showed that, during his *Faretta* hearing, Neal consistently responded to the court's inquiries in a coherent and respectful manner. Neal informed the court that he was a high school graduate with some college education. Neal stated he had studied some law on

---

[9] *See also McMurtrey v. Ryan*, 539 F.3d 1112, 1125–26 (9th Cir. 2008); *Chavez v. United States*, 656 F.2d 512, 519 (9th Cir. 1981).

his own, including the applicable rules of procedure and evidence. Neal even debated the efficacy of trained attorneys after the judge stated Neal would be better off represented by trained counsel. Neal informed the court he believed "the disadvantage of not being trained in the law acts as an advantage because those who [are] trained in the law [do] not seem to be effective."

Similarly, during trial and sentencing, the record does not include evidence that Neal manifested such conduct. Neal was responsive and rational at trial and participated effectively when he chose to do so. Neal made opening statements, closing arguments, and cross-examined witnesses with a fair degree of skill—even rephrasing his questions in response to a sustained objection. Neal also generally followed courtroom rules and protocol.

It is not disputed that Neal made numerous comments and filed a variety of documents disputing jurisdiction and other "nonsensical" issues (e.g., "[the] United States is a corporation. . . . as a corporation it cannot interact with human beings; "the sale of bonds based on Petitioners [sic] conviction by the court creates a financial conflict of interest".). However, Neal also professed a "sovereign citizen" belief system.[10] His comments and conduct were indicative of that belief, not a lack of competence. Neal cannot now use those beliefs as an expression of incompetency. "In the absence of any mental illness or uncontrollable behavior, [Neal] had the right to present [his] unorthodox defenses and argue [his] theories to the bitter end." *See Johnson*, 610 F.3d at 1147.

---

[10] *See, e.g.*, *United States v. Mitchell*, 405 F. Supp. 2d 602, 603–06 (D. Md. 2005) (describing the "sovereign citizen" belief system).

### C.  Neal's *Faretta* waiver was valid.

Neal claims that his waiver of counsel in his *Faretta* hearing was not voluntary, knowing, and intelligent.  We review whether a *Faretta* waiver satisfied these requirements de novo, even where the defendant failed to raise the issue of the validity of the *Faretta* waiver to the district court.  *United States v. Erskine*, 355 F.3d 1161, 1166–67 (9th Cir. 2004). Although no specific colloquy is required, we have held a waiver is voluntary, knowing, and intelligent if the defendant was informed and understands (a) "the nature of the charges against him," (b) "the possible penalties," and (c) "the dangers and disadvantages of self-representation."  *United States v. Balough*, 820 F.2d 1485, 1487–88 (9th Cir. 1987).

Neal's *Faretta* waiver was voluntary, knowing, and intelligent.  Prior to Neal's arraignment and plea hearing, Neal informed his appointed counsel he wished to represent himself.  Neal renewed the request at his arraignment and plea hearing.  In response to Neal's request, the court immediately conducted a *Faretta* hearing.

At the *Faretta* hearing, the court clearly explained the charges and possible penalties to Neal.  The court also explained the specific allegations to Neal.  The court informed Neal that each offense was punishable by a maximum of 10 years in prison and/or a fine of $250,000. The court, in an effort to convey the seriousness of the charges, told Neal that his sentence could be 140 years if the court decided to run the sentences consecutively.  The court also engaged in a lengthy discussion about sentencing, sentencing guidelines, and factors used by a court when sentencing.  Neal consistently assured the court that he

understood what he was being told and that he did not have any questions.

The record also established that the court spent a significant amount of time warning Neal about the dangers and disadvantages of self-representation. Neal was advised that, if he chose to represent himself, he was going to be held to the same rules of evidence and the same rules of procedure as if an attorney was representing him. The court discussed the rules of evidence and criminal procedure, explaining that the rules can prove critical in a case. Although Neal indicated he was knowledgeable about the rules, the court still cautioned that the rules were often complicated and difficult, even for lawyers. The court also explained that trial was difficult. Neal was informed he would be on his own and the court could not advise or help him. The court advised Neal it was unwise to represent himself and that he would be better off being represented by a trained attorney.[11]

However, Neal was insistent in his desire to represent himself. Neal assured the court he had no questions and that he understood the pitfalls of representing himself. When the court finally asked Neal, in light of the penalty if he was

---

[11] Continuing to caution Neal, the judge stated that if he were "charged with a crime, I would want an attorney to represent me." The judge continued, "I'm just telling you personally that I would want someone to represent me because when you have something personal at stake, sometimes you lose sight of the strategic details and other things when you're too personally involved. So although I would have long discussions with my attorney and give my attorney my opinions and try and guide them in what I thought were important things, I would be represented by an attorney if I were charged with a crime. And in my opinion I think that you'd be better served by having a trained attorney to represent you."

found guilty, whether he still wished to represent himself and give up his right to be represented by counsel, Neal responded "absolutely."

After review, the record does not evidence that Neal failed to understand the nature of the charges against him, the possible penalties, or the dangers and disadvantages of self-representation.  Neal clearly endorsed the "sovereign citizen" ideology.  Neal's request to represent himself could not be denied solely because he adhered to such beliefs.  The right to represent oneself, like the right to counsel, is secured by the Constitution.  *See Faretta v. California*, 422 U.S. 806, 814–15 (1975).  "[F]orcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so."  *Id.* at 817.  The choice must be honored even when it is ultimately to the defendant's own detriment.  *Id.* at 834.  The evidence demonstrates that Neal knew exactly what he was doing and made the choice to represent himself with eyes open.  *See Id.* at 835.

### 3.  The district court's application of the Sentencing Guidelines was not plainly erroneous.

Neal argues that the court should not have applied the two-level, multiple lien enhancement under USSG § 2A6.1(b)(2)(B) ("Offense Specific Guideline") to his sentence.  Instead, he argues, the Offense Specific Guideline only allows application of the multiple lien enhancement when there are *multiple* offenses against the *same* victim.  In Neal's circumstance, while he was convicted of fourteen offenses, each offense involved *a different* victim.

Neal also argues that, even if the Offense Specific Guideline enhancement applied, it was error for the court to

apply it here. He argues its application results in impermissible double counting. The fourteen offenses were previously accounted for when the district court increased Neal's base offense level by five points under USSG § 3D1.4 ("Multiple Count Grouping Guideline"). Therefore, Neal argues, the fourteen offenses were double counted when the court also added the multiple lien enhancement under the Offense Specific Guideline.

We review de novo the district court's interpretation of the United States Sentencing Guidelines. *United States v. Johansson*, 249 F.3d 848, 858 (9th Cir. 2001). Because Neal did not raise this objection in the district court, we review the district court's application of the Sentencing Guidelines for plain error. *United States v. Hammons*, 558 F.3d 1100, 1103 (9th Cir. 2009).

**A. It was not plain error to apply the two-level enhancement to Neal's sentence for multiple liens against multiple victims.**

USSG § 2A6.1(b)(2)(B) specifically addresses sentencing for harms associated with violations of 18 U.S.C. § 1521. It was added to the USSG after 18 U.S.C. § 1521 was enacted in 2007. *See* USSG app. C amend 718 (2007). The plain language of the subsection provides for a two-level enhancement "[i]f the defendant is convicted under 18 U.S.C. § 1521 and the offense involved *more than two false liens or encumbrances*." *See* USSG § 2A6.1(b)(2)(B) (emphasis added).

Neal contends the court should not have applied the enhancement, because he was convicted of fourteen offenses and each offense only involved *one lien*. Neal explains that

each of the fourteen liens he attempted to file was charged as a separate count and a separate violation of § 1521. Therefore, he was ultimately charged with fourteen separate offenses. Each offense represented *one lien*—each offense did not involve *more than two false liens or encumbrances*.

Neal has misinterpreted § 2A6.1(b)(2)(B). To clarify when the two-level multiple lien enhancement is applicable, we look to the application notes. *See United States v. Hernandez-Sandoval*, 211 F.3d 1115, 1117 n.3 (9th Cir. 2000) ("In general, the application notes are binding on the courts in their construction of the Sentencing Guidelines"). Application Note (1) provides:

> *Scope of Conduct to Be Considered.*—In determining whether subsections (b)(1), (b)(2), and (b)(3) apply, the *court shall consider conduct that occurred prior to or during the offense; however, conduct that occurred prior to the offense must be substantially and directly connected to the offense, under the facts of the case taken as a whole*. For example, if the defendant engaged in several acts of mailing threatening letters to the same victim over a period of years (including acts that occurred prior to the offense), then for purposes of determining whether subsections (b)(1), (b)(2), and (b)(3) apply, the court shall consider only those prior acts of threatening the victim that have a substantial and direct connection to the offense.

USSG § 2A6.1 cmt. n.1(emphasis added).  In determining whether to apply the enhancement, Note (1) requires a sentencing court to consider conduct occurring during the offense.  Note (1) also requires a sentencing court to consider prior conduct, but only if the prior conduct was substantially and directly connected to the offense.  Note (1) does not specify any number of victims to whom the conduct must occur.  Note (1) merely cautions a court to only consider conduct that is *substantially and directly connected* to the offense.  We agree that the example in Note (1) clearly indicates multiple offenses against the *same victim* is *conduct* that a court must consider.  However, because it is only an example, it does not preclude a court from applying the enhancement for multiple offenses against different victims.  Note (1) only requires that a sentencing court consider conduct occurring during the offense and conduct that occurred prior to the offense that is substantially and directly related to the offense.

In short, because Note (1) requires a sentencing court to consider conduct occurring prior to and during the offense, and does not expressly preclude a court from considering other charged offenses aimed at different victims, it was not plain error for the district court to conclude that Neal's offense (placing a lien on a victim) "involved" the false liens placed on other victims that occurred prior to and during the offense conduct.  Therefore, on plain error review, we cannot say the court committed error when it concluded that Neal's offense made him eligible for an enhancement under USSG § 2A6.1(b)(2).[12]

---

[12] The question of whether we would have reached the same conclusion if we were deciding the question in the first instance is not before us.

## B.  It was not plain error for the district court to apply multiple enhancements to Neal's sentence.

"As a general rule, it is appropriate for a court to consider all applicable Guidelines provisions in calculating the guidelines range for an offense.  In particular, the Sentencing Guidelines contemplate that courts will apply all applicable specific offense characteristics to enhance the base offense level." *United States v. Smith*, 719 F.3d 1120, 1123 (9th Cir. 2013); *see also* USSG § 1B1.1(a)(2).

We infer that the Sentencing Commission would not intend us to apply a Guideline provision that "would increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." *Smith*, 719 F.3d at 1124 (internal quotation marks omitted).  However, "when each invocation of the behavior serves a unique purpose under the Guidelines, we conclude that the Commission authorized and intended the cumulative application of both provisions." *Id*. (internal quotation marks omitted).

On plain error review, we cannot say the district court committed error when determining Neal's sentence.  The district court applied upward enhancements under the Multiple Count Grouping Guideline § 3D1.4 and under the Offense Specific Guideline § 2A6.1(b)(2)(B).  Because the enhancements serve distinct purposes, we conclude that the Commission "authorized and intended" the cumulative application of both provisions. *See Smith*, 719 F.3d at 1124.

### i.   Multiple Count Grouping Guideline § 3D1.4

Section § 3D1.4 provides for upward enhancements when a defendant commits multiple offenses.  Because Neal was convicted of fourteen offenses, Neal's base offense level was increased by five points.  Section § 3D1.4 accomplishes the Guidelines' overall objective of providing "incremental punishment for a defendant who is convicted of multiple offenses."  *See United States v. Watts*, 519 U.S. 148, 154 (1997).

### ii.   Offense Specific Guideline § 2A6.1(b)(2)(B).

On the other hand, the enhancement under Section 2A6.1(b)(2)(B) serves a distinct purpose from the purpose of Section 3D1.4.  The Offense Specific Guideline § 2A6.1(b)(2)(B) enhancement accounts for "the additional time and resources required to remove multiple false liens or encumbrances," rather than accounting for incremental punishment for multiple offenses.  *See* USSG app. C amend. 718 (2007).  The Comments to the Amendment enacting § 2A6.1(b)(2)(B) provide:

> *[T]he amendment expands the scope of the two-level enhancement at subsection (b)(2) to apply if the defendant is convicted under 18 U.S.C. § 1521 and the offense involved more than two false liens or encumbrances, and* also provides an upward departure provision that may apply if the offense involved substantially more than two false liens or encumbrances against the real or personal property of the same victim. *These modifications reflect the additional time and*

> *resources required to remove multiple false*
> *liens or encumbrances*.

*Id*. (emphasis added). According to the Comments, the § 2A6.1(b)(2) enhancement may be imposed for one of two reasons (only one of which Neal challenges). The enhancement focuses on the number of false liens or encumbrances, not the number of victims.

Additionally, § 2A6.1 Application Note (4)(B) specifically allows for an upward departure if the offense involved multiple liens and multiple victims. Note (4)(B) provides:

> (B) *Multiple Threats, False Liens or*
> *Encumbrances, or Victims; Pecuniary*
> *Harm*.—If the *offense involved*
> (i) substantially more than two threatening
> communications to the same victim, (ii) a
> prolonged period of making harassing
> communications to the same victim,
> (iii) substantially more than two false liens or
> encumbrances against the real or personal
> property of the same victim, (iv) *multiple*
> *victims*, or (v) substantial pecuniary harm to a
> victim, an *upward departure may be*
> *warranted*.

USSG § 2A6.1 cmt. n.4(b) (emphasis added).

On plain error review, we cannot say the district court committed error in applying multiple enhancements to Neal's sentence.

**4.  The district court did not plainly err in imposing Neal's sentence, despite Neal's presentence report incorrectly listing the lengths of his previous sentences.**

Neal argues that the district court imposed a longer sentence than it otherwise would have imposed, because his presentence report incorrectly reported the lengths of his previous sentences.  Neal's previous convictions were listed in the criminal history section of his presentence report.  The presentence report indicated Neal was convicted of eight separate counts related to a bank robbery.  Each count was listed separately along with its corresponding sentence (in months).  However, the presentence report did *not* include a total number of months of imprisonment for the eight related counts.

Neal argues that, if the months of imprisonment listed in the presentence report for the eight counts related to the bank robbery had been totaled, that total would show the report had incorrectly listed the length of the individual sentences.  We agree that, if the individual sentences listed in the presentence report had been totaled, the total would have been 425 months of incarceration, even though Neal was actually sentenced to a total of 665 months of incarceration for the related counts.  However, we find no evidence to substantiate Neal's argument that, "[i]f the court had known" his previous sentence was 665 months instead of 425 months as indicated in the presentence report, "there was a reasonable probability that the court would have imposed a lesser [current] sentence."  Neal is correct, his presentence report did not indicate the correct total number of months of imprisonment for his previous sentences.  However, Neal has provided no evidence to indicate that the probation office used the length

of his previous sentences (correct or incorrect) at all, in its Sentencing Guidelines calculation. Nor is there evidence that the lengths of Neal's previous sentences were used for the probation office's within-Guidelines recommendation for Neal's current sentence.

Similarly, there is no evidence to indicate the court used Neal's previous sentences when determining the current sentence. The district court sentenced Neal in accordance with the Guidelines. According to USSG § 5G1.3(a) "[i]f the instant offense was committed while the defendant was serving a term of imprisonment . . . the sentence for the instant offense shall be imposed to *run consecutively* to the undischarged term of imprisonment." (Emphasis added). When sentencing Neal, the district court ordered that "[a]ny sentence imposed is to be served consecutively, however, to *any undischarged term* of imprisonment which the defendant is currently serving." (Emphasis added). Because the district court neither miscalculated Neal's sentence nor relied on erroneous information in calculating his sentence, we conclude that the sentence imposed was not plainly erroneous.

For the foregoing reasons, Neal's conviction and sentence are **AFFIRMED**.