**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE PETTIT OIL COMPANY, *Debtor*, | No. 17-60081 |
| | BAP No. WW-16-1424-KuFB |
| IPC (USA), INC., a California corporation, *Appellant*, | |
| v. | OPINION |
| KATHRYN A. ELLIS, Chapter 7 Trustee, *Appellee.* | |

Appeal from the Ninth Circuit Bankruptcy Appellate Panel
Kurtz, Faris, and Brand, Bankruptcy Judges

Argued and Submitted December 6, 2018
Seattle, Washington

Filed March 11, 2019

Before: William A. Fletcher and Jay S. Bybee, Circuit
Judges, and Larry A. Burns,[*] Chief District Judge.

Opinion by Judge Burns

**SUMMARY**[**]

**Bankruptcy**

The panel affirmed the Bankruptcy Appellate Panel's
affirmance of the bankruptcy court's summary judgment in
favor of a bankruptcy trustee who brought an adversary
proceeding seeking avoidance of transfers.

The debtor, a distributor of bulk petroleum products,
entered into a consignment agreement with IPC (USA), Inc.
Under the agreement, IPC delivered fuel to "card lock" sites
from which the debtor's commercial customers purchased
fuel using access cards. When the debtor filed for
bankruptcy, it had in its possession IPC fuel as well as
proceeds from sold fuel, in the form of cash and accounts
receivable, that had not yet been remitted to IPC.

U.C.C. § 9-319(a) grants a consignee "rights and title to
the goods." If a consignee files for bankruptcy, any
consigned "goods" in its possession become property of the
bankruptcy estate unless the seller has previously provided

---

[*] The Honorable Larry Alan Burns, Chief United States District
Judge for the Southern District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It
has been prepared by court staff for the convenience of the reader.

public notice of its interest in the goods (normally by filing a document known as a "financing statement") and thereby "perfected" its interest. The panel held that this rule also extends to the proceeds from goods sold that are held by the consignee on the date it files for bankruptcy. Thus, IPC's unperfected security interest in the fuel and the proceeds was subordinate to the trustee's interest.

## COUNSEL

Edwin K. Sato (argued), Bucknell Stehlik Sato & Orth LLP, Seattle, Washington, for Appellant.

Andrew H. Morton (argued), Deborah A. Crabbe, Foster Pepper PLLC, Seattle, Washington, for Appellee.

## OPINION

BURNS, Chief District Judge:

In a consignment transaction, a seller (the "consignor") delivers goods to a middleman (the "consignee") who holds the goods until they are sold to a buyer, at which point the sale proceeds are transferred back to the seller. Under settled bankruptcy law, if a consignee files for bankruptcy, any consigned "goods" in its possession become property of the bankruptcy estate unless the seller has previously provided public notice of its interest in the goods (normally by filing a document known as a "financing statement") and thereby "perfected" its interest. At issue in this case is whether this rule also extends to the *proceeds* from goods sold that are held by the consignee on the date it files for bankruptcy. We

conclude that it does, and affirm the judgment of the Bankruptcy Court and the Bankruptcy Appellate Panel.

## I.

The Debtor here, Pettit Oil Company, was a distributor of bulk petroleum products. Part of Pettit's business involved operating "card lock" sites, where commercial customers purchased fuel products using access cards. In 2013, Pettit entered into a consignment agreement with IPC (USA), Inc. ("IPC"), under which IPC was to deliver consigned fuel to card lock sites so Pettit could sell the fuel to its customers. The aim was to reduce Pettit's working capital needs by outsourcing its fuel sales to IPC. In return for being able to sell its fuel at Pettit's stations, IPC paid Pettit a monthly commission.

As with all "true" consignments, ownership of the fuel remained with IPC until it was sold, at which time title transferred to the purchaser. Whenever a customer purchased consigned fuel, Pettit prepared an invoice and instructed the customer to remit payment to IPC directly. Despite this instruction, some customers continued to pay Pettit for their purchases of IPC fuel. Anticipating this might occur, the agreement provided that Pettit would "promptly forward such payment[s] to IPC," and Pettit did so regularly. Nonetheless, when Pettit ultimately filed for bankruptcy, it had in its possession not just IPC fuel but also proceeds from sold fuel that had not yet been remitted to IPC. These proceeds took two forms: (1) cash and (2) accounts receivable—that is, balances owed by customers that had not yet been paid. It is undisputed that IPC never filed a financing statement or otherwise perfected its interests in the consigned fuel, the accounts receivable, or the cash.

After Pettit filed for bankruptcy, the Trustee commenced this proceeding seeking, among other things, the value of the fuel, accounts receivable, and cash proceeds for the benefit of the bankruptcy estate. The Trustee maintained that IPC's interest in the fuel, the cash proceeds, and accounts receivable was subordinate to the Trustee's because IPC hadn't filed a financing statement or otherwise perfected its interest. The Bankruptcy Court entered summary judgment in the Trustee's favor, and the Bankruptcy Appellate Panel affirmed.

## II.

We independently review decisions of the Bankruptcy Court and the Bankruptcy Appellate Panel. *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1142 (9th Cir. 2002). Conclusions of law are reviewed de novo, while factual findings are reviewed for clear error. *Id.*

## III.

IPC's principal argument is that the bankruptcy courts erred in concluding that the Trustee's interest in the cash and accounts receivable was superior to IPC's. In IPC's view, although the Trustee may have a superior interest in the "goods"—i.e., the fuel—that interest does not extend to cash proceeds and accounts receivable that happened to be in Pettit's possession when it filed for bankruptcy. IPC's argument presents a single question of law: whether U.C.C. § 9-319(a), which grants a consignee "rights and title to the goods," also grants the consignee an interest in the *proceeds* of those goods that were generated prior to bankruptcy. We hold that it does.

**A.**

When a debtor goes into bankruptcy, the bankruptcy trustee is automatically granted a judicial lien over all property the debtor owns as of the petition date. *See* 11 U.S.C. § 544(a)(1). A creditor wishing to shield a particular asset from the reach of the trustee can do so only if the creditor can show that its interest in the asset is superior to a judicial lien, a determination governed by various statutory priority rules. Otherwise, the trustee's judicial lien remains superior and the trustee can "avoid" (i.e., block) any transfers of the asset outside the bankruptcy estate.

IPC maintains that we should apply traditional property law principles to hold that the proceeds in Pettit's possession are outside the scope of the Trustee's avoidance powers because the proceeds were not owned by Pettit. More specifically, IPC maintains that we should treat the proceeds as if they were the product of a bailment—that is, a transfer of *possession* without a transfer of *ownership*. *See, e.g.*, 5 Collier on Bankruptcy ¶ 541.05[1][b] (16th ed.) (2018) ("In ordinary commercial practice, a consignment is equivalent to a bailment for care or sale, wherein there is no obligation to purchase in the consignee."). Although this logic would also suggest that the goods themselves are outside the Trustee's avoidance powers, IPC concedes (as it must) that Article 9 of the Uniform Commercial Code ("U.C.C.") forecloses this argument. Section 9-319(a) of the U.C.C. provides, "for purposes of determining the rights of creditors of . . . a consignee, while the *goods* are in the possession of the consignee, the consignee is deemed to have rights and title to the *goods* identical to those the consignor had." (emphasis added). This provision means that even though a consignee doesn't truly own the consigned goods, the U.C.C. treats the consignee as having an ownership interest. So,

here, with Pettit's ownership interest established, the parties agree that IPC's unperfected security interest in the fuel is subordinate to the Trustee's judicial lien. *See In re First T.D. & Inv., Inc.*, 253 F.3d 520, 525 (9th Cir. 2001) ("Under 11 U.S.C. § 544(a), unperfected security interests are avoidable and can be relegated to the status of general unsecured claims.").

Nonetheless, IPC argues that even if its interest in the fuel is subordinate to that of the Trustee, its interest in the cash and accounts receivable is superior because these assets aren't "goods." In other words, according to IPC, because the drafters of U.C.C. § 9-319(a) said "goods" instead of "goods and proceeds," Article 9—which governs priority and perfection rules related to various types of security interests, including consignments—cannot dictate the rules regarding the proceeds of the goods. The problem with this strained reading of section 9-319 is that it ignores numerous references throughout the U.C.C. that treat a consignment as a security interest for all practical purposes. *See, e.g.*, U.C.C. § 9-102(a)(73)(C) (defining "[s]ecured party" to include a "consignor"); U.C.C. § 1-201(b)(35) (defining "[s]ecurity interest" to include "*any* interest of a consignor") (emphasis added); U.C.C. § 9-102(a)(12)(C) (defining "[c]ollateral" to mean "the property subject to a security interest" that includes "goods that are the subject of a consignment"). The most natural reading of these provisions is that a consignor's interest in goods (and the related proceeds) is a security interest for all purposes—including for purposes of perfection and priority—unless the U.C.C. specifically says otherwise.

The best example of the inconsistency in IPC's argument is U.C.C. § 9-324(b), which states, "a *perfected* [interest] in inventory has priority over a conflicting security interest in

the same inventory . . . and . . . also has priority in identifiable cash proceeds of the inventory." (emphasis added). Had IPC availed itself of this protection by perfecting its interest in the fuel, it would have had priority over the Trustee's judicial lien extending not just to the fuel, but also to the proceeds. And there is no persuasive reason to interpret Article 9 as limiting the reciprocal effect—that a consignor loses priority in the proceeds when it fails to perfect its interest.

Moreover, the "goods" provision of section 9-319 can't be read in a vacuum. "We must interpret the statute as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *United States v. Neal*, 776 F.3d 645, 652 (9th Cir. 2015) (internal alterations and quotations omitted). Consistent with this rule of construction, and read in light of Article 9's other provisions, we hold that the term "goods" in section 9-319(a) includes the proceeds of those goods, and that Article 9's priority and perfection rules apply with equal force to such proceeds.

Although IPC argues the result should be different because it retained title to the proceeds, the U.C.C. is clear that IPC's retention of title does not matter. Section 9-202 of the U.C.C. states that "[e]xcept as otherwise provided with respect to consignments . . . , the provisions of [Article 9] with regard to rights and obligations apply whether title to collateral is in the secured party or the debtor." Retention of title affects the remedies IPC could employ to recover the goods in the event of default, but title is irrelevant to whether IPC or the Trustee has priority in the goods and proceeds. *See* U.C.C. § 9-202, cmt. 3.a.

Our conclusion that the term "goods" in section 9-319 includes the proceeds of those goods is bolstered by the policy rationale underlying these rules. To the outside world, goods and proceeds held by a consignee appear to be owned by the consignee, and creditors might reasonably believe as much when they decide to lend the consignee money. The perfection and priority rules—which require that the consignor publicly announce its interest in the consigned goods or else go to the back of the line when the consignee goes bankrupt—serve to protect unwary creditors and prevent "secret liens" in the goods that might otherwise dissuade such lending. *See In re Valley Media, Inc.*, 279 B.R. 105, 125 (D. Del. Bankr. 2002) ("The purpose of . . . 9-319(a) is to protect general creditors of the consignee from claims of consignors that have undisclosed consignment arrangements with the consignee that create secret liens on the inventory."). A ruling that "proceeds" are outside the scope of the perfection rules would disrupt the delicate balance the U.C.C. drafters struck between the interests of consignors and the interests of the consignee's other creditors. IPC has not provided a convincing basis for disrupting this intended balance.

## B.

We also reject IPC's argument that the Trustee can't have an interest in the proceeds because 11 U.S.C. § 544(a)—which establishes the Trustee as a judicial lien holder—doesn't contain a "reachback" provision that would allow it to claim an interest in cash and accounts receivable that arose before Pettit filed its bankruptcy petition. Section 544 grants the Trustee "a judicial lien on all *property* on which a creditor on a simple contract could have obtained such a judicial lien." 11 U.S.C. § 544(a)(1) (emphasis added). However we characterize the Trustee's interest in

the "property" (i.e., the proceeds), that interest is identical to the interest held by IPC. *See* U.C.C. § 9-319(a) ("[T]he consignee is deemed to have rights and title to the goods identical to those the consignor had."). IPC undoubtedly could have secured a lien on the proceeds, so the Trustee could have as well. Accordingly, the lack of a "reachback" provision is no barrier to the Trustee claiming an interest in proceeds that arose pre-petition.

**AFFIRMED.**