**Opinion filed December 12, 2024**



In The

# Eleventh Court of Appeals

_____

## Nos. 11-23-00147-CR & 11-23-00148-CR

_____

## ROMAN ANGELO ROYAL, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 132nd District Court**
**Scurry County, Texas**
**Trial Court Cause Nos. 11108 & 11110**

## O P I N I O N

In a trial of consolidated causes, a jury convicted Appellant, Roman Angelo Royal, of aggravated assault against a public servant, a first-degree felony, and evading arrest or detention with a vehicle, a third-degree felony. *See* TEX. PENAL CODE ANN. §§ 22.02(b)(2)(B), 38.04(b)(2)(A) (West Supp. 2024). The jury, having found the enhancement allegation to be "true," assessed Appellant's punishment at

imprisonment for ninety-nine years in the Institutional Division of the Texas Department of Criminal Justice for the aggravated-assault conviction, and twenty years for the evading-with-a-vehicle conviction. *Id.* § 12.42(b) (West 2019). The trial court sentenced Appellant accordingly.

In six issues on appeal, Appellant challenges: (1) the trial court's determination that he was competent to stand trial; (2) the trial court's finding that he knowingly, intelligently, and voluntarily waived his right to counsel; (3) the trial court's denial of his motion to suppress evidence; (4) the sufficiency of the evidence to support his conviction for aggravated assault against a public servant; (5) the trial court's assessment of court costs; and (6) clerical errors in the trial court's judgments. We modify and affirm.

## I. *Factual Background*

On November 14, 2022, around 3:30 p.m., Officer Mitchell Silva, with the Snyder Police Department, observed Appellant driving a tan or gold Buick; he then began following Appellant. Officer Shane Rackley, who was also on patrol, informed Officer Silva that Appellant had an outstanding warrant. As Appellant turned into an alleyway, Officer Silva attempted to initiate a traffic stop. However, Appellant continued driving until he saw Officer Rackley enter the alley from the opposite street.

The officers approached Appellant's closed driver side window, referred to Appellant by name, and advised him that he was wanted for committing a misdemeanor offense in a contiguous county. Appellant refused to identify himself and ignored the officers' commands to roll down the driver side window, cracking it only to aggressively contest his identity, and continued to rebuff law enforcement's repeated commands for the next thirty to forty-five minutes. Snyder

Police Chief Brian Haggard and Lieutenant Mike Counts eventually arrived at the scene because Appellant demanded to speak to "somebody with rank."

When Appellant began calling 9-1-1 to argue with dispatch, the officers decided to arrest him for "[tying] up 9-1-1" and preventing dispatch from receiving incoming emergency calls. *See* PENAL §§ 42.061–.062 (West 2016); TEX. CODE CRIM. PROC. ANN. art. 14.01(b) (West 2015). Due to Appellant's persistent defiance, the officers attempted to forcefully extricate him from the vehicle. Chief Haggard used an asp baton to "knock[] a hole in the [driver side] window so [they] could get the vehicle unlocked." When Officer Rackley reached through the broken window with part of his hand to deploy pepper spray, Appellant "slammed [the vehicle] into drive, hit the gas[,] and sped off." Officer Rackley was "barely able to get [his] hand" out of the window as Appellant fled in the vehicle, and as a result he sustained "a bunch of cuts on [his] right hand." Appellant crashed into two police vehicles as he sped away.

Police lost sight of Appellant until around 5:30 p.m., when they were investigating "a possible break-in" on a ranch outside the city limits. That evening, Appellant stole Nona Key's tractor from her barn, led police on a pursuit through her ranch, then drove the tractor into a stock tank, totaling it. Stranded in the middle of the stock tank and surrounded by law enforcement from multiple jurisdictions, Appellant remained in the tractor for over an hour until police eventually deployed a pepper ball gun into the tractor's cab. Despite this, Appellant stood on the hood of the tractor, still refusing to comply with the officers' commands. Appellant finally swam to shore and was apprehended after Lieutenant Counts shot him with the pepper ball gun. He was subsequently indicted for evading arrest or detention with a vehicle and aggravated assault against a public servant.

From arraignment onward, Appellant claimed to only understand and acknowledge "universal law and natural law." When the trial court asked Appellant whether he understood the nature of the charges pending against him, he replied:

[APPELLANT]: I do not understand any charges against me, because the only thing I do understand is universal law . . . .

[TRIAL COURT]: Are you aware of the maximum penalty for each of these charges?

[APPELLANT]: I don't accept your charges . . . I do not accept the charges. I am not the trustee or the all capitalized name that you keep trying to operate through.

. . . .

[TRIAL COURT]: Do you believe that you are mentally competent?

[APPELLANT]: I am definitely competent.

[TRIAL COURT]: Do you understand that if you are found guilty --

[APPELLANT]: I do not understand --

[TRIAL COURT]: -- of one or more of these crimes --

[APPELLANT]: -- the charges or crimes.

[TRIAL COURT]: -- this might result in an order that sentences be served consecutively, and that is one after the other?

[APPELLANT]: No, I don't understand that . . . I do not understand nothing you're asking me or you're telling me . . . . Once again, I do not understand anything you're saying because it seems like to me this Court is privateers for a Jolly Roger flag anyways. It's not an American flag of peace.

Appellant filed a motion to suppress challenging the propriety of the traffic stop, which the trial court denied. Robert Jones was Appellant's retained trial counsel at the hearing on the motion. Prior to jury selection, Appellant again declared that "nobody in this courtroom has permission to act on my behalf," and

that Jones was "hereby fired." Outside the presence of the venire panel, the trial court discussed Appellant's request and decision to represent himself:

> [TRIAL COURT]: . . . You have the [Sixth] Amendment right to have an attorney represent you . . . . Do you want an attorney representing you and acting on your behalf?
>
> . . . .
>
> [APPELLANT]: I stand as myself.
>
> [TRIAL COURT]: Okay. You also have the [Sixth] Amendment right to represent yourself if you want to. I'm trying really hard to protect your rights . . . . I will not force you to accept someone acting on your behalf . . . . I need to be sure that your decision to represent yourself is not . . . made under coercion as a result of threats, as a result of duress.
>
> . . . .
>
> [APPELLANT]: I am competent in stating my own commercial business. I do not need assistance.

The trial court asked Appellant his age, whether he graduated from high school, and assessed his ability to read and write the English language. Although he refused to provide his age and level of education, Appellant eventually confirmed that he "speak[s] common English"; he had also submitted numerous handwritten pretrial motions. The trial court then inquired as to whether Appellant was under the influence of drugs:

> [APPELLANT]: I'm not going to ensnare myself with words to be used against me when you're asking questions that have nothing to do with my commercialized affairs.
>
> [TRIAL COURT]: Are you under the influence of alcohol?
>
> [APPELLANT]: Are you an American citizen?
>
> [TRIAL COURT]: Have you ever been adjudicated to be incompetent?
>
> [APPELLANT]: . . . Do you believe in God?

> [TRIAL COURT]: Have you been adjudicated . . . as incompetent?
>
> [APPELLANT]: I am competent in stating all my affairs.
>
> . . . .
>
> [APPELLANT]: You know what, this is really an overthrow of the Constitution, because as a natural living man I don't believe you can ask me these questions and expect me to answer.
>
> [TRIAL COURT]: Are you currently suffering from any mental disability?
>
> [APPELLANT]: No, I'm not.

When asked whether he was familiar with the law or had previously represented himself, Appellant steadfastly "reserve[d] [his] right to remain silent." As the trial court explained the elements of the pending charges and the punishment range for each offense, Appellant intermittently interrupted with remarks such as: "I do not understand any charges, and I do not stand under any charges. The only law I understand is universal law and natural law." And "I do not accept those charges . . . I am a natural living man. I am not an all capitalized corporate fiction . . . ." Any time Jones spoke, Appellant objected to him "speaking for or thinking on [his] behalf," and directed Jones to "just keep [his] thoughts to [himself]."

The trial court advised Appellant that if he represented himself, no one would be responsible for assisting him. He confirmed that he did not want Jones's assistance: "[Jones] doesn't even need to be in my business, period." The trial court inquired whether Appellant understood specific rules of evidence and criminal procedure, and whether he knew how to select a jury, protect the record for purposes of appeal, move for a mistrial or judgment of acquittal, and request or object to proposed jury instructions. After Appellant continuously invoked his "right to remain silent," the trial court stated:

6

[TRIAL COURT]:  . . . I find that your decision to represent yourself is not a good decision to make.

[APPELLANT]:  Well, I object to your decision . . . .  My rights are reserved.

[TRIAL COURT]:  I think that you would be far better off if you were defended by an attorney.

[APPELLANT]:  I don't need anyone to defend me.

[TRIAL COURT]:  And I think it's unwise of you to try to represent yourself.  You're not familiar with the law . . . .

[APPELLANT]:  You can't make that legal determination on what I'm familiar with because I didn't answer your questions.

Appellant finally confirmed that he was not forced, threatened, or coerced into waiving his right to counsel and asserting his right to self-representation.  Ultimately, the trial court found that Appellant was competent and that he knowingly and voluntarily invoked his right to self-representation.  The trial court concluded:

> . . . [W]hat I've said is plain, it's evident, and I find that -- I believe that you are an intelligent young man because I have observed your ability to analyze situations.  I've observed your ability to express yourself verbally.  I have no indication at all that you have the inability to understand these proceedings and to understand the roles that different people have in this proceeding.
>
> I find that you are mentally competent and that factors into my decision to allow you to represent yourself.

Jones then began to suggest that Appellant should undergo a psychiatric evaluation and urged his motion for a competency hearing.  But Appellant interrupted: "I think this guy is incompetent to even speak in the courtroom in my opinion."  The trial court told Jones that he could call witnesses and present evidence in support of his motion, but reiterated that, based on her observations, Appellant was mentally competent.  Jones asked Appellant's mother if she wanted to testify, and after

7

another interjection from Appellant, Jones withdrew his motion and presented no evidence regarding Appellant's competency.

After that, Jones served as standby counsel for the duration of Appellant's trial. Appellant conferred with Jones throughout the guilt-innocence phase, permitted him to present an opening statement, aid in cross-examination, and present a closing argument. Appellant cross-examined most of the State's witnesses, lodged several objections to the State's evidence and the exhibits it offered, and presented the testimony of five witnesses in his defense. The jury found Appellant guilty of both charged offenses, assessed his punishment, and the trial court sentenced Appellant accordingly. This appeal followed.

## II. *Sufficiency of the Evidence: Aggravated Assault*

Appellant contends in his fourth issue that the evidence is legally insufficient to sustain his conviction for aggravated assault against a public servant.

### A. *Standard of Review*

We review a challenge to the sufficiency of the evidence, regardless of whether it is framed as a legal or factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Garcia v. State*, 667 S.W.3d 756, 761 (Tex. Crim. App. 2023).

When conducting a sufficiency review, we consider all the evidence admitted at trial, including evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Lee v. State*, 676 S.W.3d 912,

915 (Tex. App.—Eastland 2023, no pet.). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *See* CRIM. PROC. art. 36.13 (West 2007); *Garcia*, 667 S.W.3d at 762 ("[A] reviewing court does not sit as a thirteenth juror and may not substitute its judgment for that of the factfinder by reevaluating the weight and credibility of the evidence."). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Garcia*, 667 S.W.3d at 761 (quoting *Jackson*, 443 U.S. at 319). Therefore, if the record supports conflicting inferences, we presume the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Garcia*, 667 S.W.3d at 762.

We treat direct and circumstantial evidence equally under this standard. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *Ruiz v. State*, 631 S.W.3d 841, 851 (Tex. App.—Eastland 2021, pet. ref'd). It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish the defendant's guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)); *Lee*, 676 S.W.3d at 915. Each fact need not point directly and independently to the defendant's guilt if the cumulative force of all incriminating circumstances is sufficient to support the defendant's conviction. *Hooper*, 214 S.W.3d at 13. Because evidence must be considered cumulatively, we may not use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Rather, we must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017).

Finally, we measure the sufficiency of the evidence by the elements of the charged offense as defined by the hypothetically correct charge for the case. *Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016); *see also Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). In this regard, to determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt under the *Jackson* standard, we compare the elements of the offense to the evidence adduced at trial. *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014) (citing *Malik*, 953 S.W.2d at 240). The hypothetically correct charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240.

B. *The Evidence is Legally Sufficient to Support Appellant's Conviction*

As applicable to this case, a person commits the offense of aggravated assault against a public servant by intentionally, knowingly, or recklessly causing bodily injury to a public servant lawfully discharging an official duty, and by using or exhibiting a deadly weapon during the commission of the assault. PENAL §§ 22.01(a)(1), 22.02(a)(2), (b)(2)(B). With respect to causation, "[a] person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." *Id.* § 6.04(a) (West 2021). While the defendant's voluntary act or acts must be a direct cause of the victim's injuries, they need not be the sole cause. *Williams v. State*, 235 S.W.3d 742, 755 (Tex. Crim. App. 2007). "Bodily-injury assault is a result-oriented offense" and requires a showing that the accused at least

10

acted recklessly in causing the resulting bodily injury. *Simms v. State*, 629 S.W.3d 218, 223 (Tex. Crim. App. 2021).

A person acts recklessly, or is reckless, with respect to the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. PENAL § 6.03(c). "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.* Recklessness does not require the awareness or conscious disregard of a *specific* injury. *See Simms*, 629 S.W.3d at 223 (requiring proof of a "reckless state of mind with respect to [the appellant's] actions . . . but not with respect to any particular result"). Rather, at the heart of recklessness is the conscious disregard of the risk created by the actor's conduct. *Williams*, 235 S.W.3d at 751. "Such a 'devil may care' or 'not giving a damn' attitude toward the risk distinguishes the culpable mental state of criminal recklessness from that of criminal negligence." *Id.* at 751–52.

Here, the evidence established that Appellant, at the very least, recklessly caused Officer Rackley's hand injuries. The bodycam footage corroborated the officers' testimony—that as Officer Rackley placed his hand inside Appellant's vehicle to pepper spray Appellant, Appellant "hit the gas[,] and sped off with such force that [Officer Rackley] was barely able to get [his] hand back away from the window." Therefore, a rational jury could have found that, as a result of Appellant's actions, Officer Rackley suffered cuts to his hand. A rational jury could likewise have found that Appellant, knowing there were several officers standing near and around his vehicle, was aware of and disregarded the substantial and unjustifiable risk that he could cause bodily injury to others by "slamm[ing] [the vehicle] into drive" and accelerating away from them. *See* PENAL §§ 6.03(c); 22.01(a)(1);

22.02(b)(2)(B). Accordingly, we conclude that the evidence is legally sufficient to support Appellant's conviction for aggravated assault against a public servant as charged in the indictment.

We overrule Appellant's fourth issue.

### III. *Motion to Suppress Evidence*

Appellant argues in his third issue that the trial court erroneously denied his motion to suppress evidence because the "[traffic] stop was unreasonable and not based on any true facts, much less probable cause of a valid traffic violation." But Appellant was not stopped for committing a traffic violation. Rather, Officers Rackley and Silva testified that they initiated the traffic stop based on their knowledge that Appellant had an outstanding warrant for a Class A misdemeanor offense that he committed in Mitchell County. The stop, therefore, was justified based on the officers' reasonable suspicion rather than the existence of probable cause.

### A. *Standard of Review and Applicable Law*

"We review a trial court's denial of a motion to suppress under a bifurcated standard of review." *Igboji v. State*, 666 S.W.3d 607, 612 (Tex. Crim. App. 2023). We defer to a trial court's findings of historical facts and determinations of mixed questions of law and fact that turn on credibility and demeanor, so long as they are supported by the record. *State v. Espinosa*, 666 S.W.3d 659, 667 (Tex. Crim. App. 2023); *State v. Arellano*, 600 S.W.3d 53, 57 (Tex. Crim. App. 2020). We conduct a de novo review of a trial court's legal conclusions and application of the law to facts that do not depend on witness credibility and demeanor. *Monjaras v. State*, 664 S.W.3d 921, 926 (Tex. Crim. App. 2022); *Arellano*, 600 S.W.3d at 57. "The trial court's ruling will be sustained if it is correct on any applicable theory of law and the record reasonably supports it." *Arellano*, 600 S.W.3d at 57–58. When, as in this

12

case, the trial court makes explicit fact findings, "we determine whether the evidence, (viewed in the light most favorable to the trial court's ruling) supports these fact findings." *State v. Hardin*, 664 S.W.3d 867, 872 (Tex. Crim. App. 2022) (citing *State v. Kelly*, 204 S.W.3d 808, 819 (Tex. Crim. App. 2006)).

A warrantless traffic stop is a Fourth Amendment seizure that must be justified by reasonable suspicion. *Id.* at 872. "Reasonable suspicion exists if the officer has specific articulable facts that, combined with rational inferences from those facts, would lead the officer to reasonably conclude the person is, has been, or soon will be engaged in criminal activity." *Id.* "The [reasonable suspicion] standard requires only 'some minimal level of objective justification' for the stop." *Hamal v. State*, 390 S.W.3d 302, 306 (Tex. Crim. App. 2012) (quoting *Foster v. State*, 326 S.W.3d 609, 614 (Tex. Crim. App. 2010)). This is an objective inquiry that disregards the subjective intent of the officer and looks, instead, to whether an objectively justifiable basis for the detention existed. *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011). When determining whether reasonable suspicion existed, we consider the totality of the circumstances, including the cumulative information known to cooperating officers at the time of the detention. *Furr v. State*, 499 S.W.3d 872, 878 (Tex. Crim. App. 2016); *see also State v. Martinez*, 569 S.W.3d 621, 626 (Tex. Crim. App. 2019) ("[U]nder [the] 'collective knowledge' doctrine, when several officers are cooperating, their cumulative information may be considered in assessing reasonable suspicion or probable cause." (quoting *State v. Duran*, 396 S.W.3d 563, 569 n.12 (Tex. Crim. App. 2013))).

B. *The Legality of the Traffic Stop*

As we construe it, Appellant complains that when the officers initiated the traffic stop, they "did not know who was driving," and the only reason for the stop

13

was "to establish who was driving."[1]  However, according to Officers Rackley and Silva, the existence of Appellant's outstanding warrant provided the basis for the traffic stop.

An initial computer check that reveals that a vehicle's driver may have outstanding warrants contributes to the officer's reasonable suspicion for a traffic stop.  *See Gomez v. State*, 234 S.W.3d 696, 701 (Tex. App.—Amarillo 2007, no pet.); *see also Garcia v. State*, No. 11-21-00145-CR, 2024 WL 3528547, at *4 (Tex. App.—Eastland July 25, 2024, no pet. h.) (mem. op., not designated for publication); *Beaudoin v. State*, No. 01-10-00058-CR, 2011 WL 3612285, at *3 (Tex. App.— Houston [1st Dist.] Aug. 18, 2011, no pet.) (mem. op., not designated for publication) ("[T]he police officers' initial computer search revealed one of appellant's outstanding warrants and provided reasonable suspicion for the initial stop.").  Additionally, an officer is authorized to execute a warrant upon observing a wanted person in public.  *See* CRIM. PROC. art. 15.06 (arrest warrants "shall extend to any part of the State; and any peace officer . . . shall be authorized to execute the same in any county in this State"), art. 15.24 ("all reasonable means are permitted" in executing an arrest warrant).

Despite Appellant's assertion that his identity was unknown to the officers prior to the stop, Officer Silva testified that he recognized Appellant as the driver of the Buick.  Further, Officers Silva and Rackley testified that they were familiar with Appellant from previous encounters.  Officer Silva crossed paths with Appellant while working as a corrections officer where Appellant was incarcerated.  Officer Rackley first encountered Appellant in August 2022, approximately a year after his release from prison.  Appellant had locked his girlfriend, Kylen Ray, out of her

---

[1]Appellant asserts in his brief that the officers "did not know who was driving the vehicle to justify stopping the vehicle to establish who was driving the vehicle."

apartment without her keys. Officer Rackley spoke to Appellant through the door and was "able to clearly see him" through the window. He learned that Appellant had an outstanding misdemeanor arrest warrant but left the premises without executing the warrant after Appellant tossed Ray's keys outside.[2]

On November 12, 2022, Kim Davis, Ray's mother, called police because Appellant was "driving around [her] house, parking in front, yelling at [Ray]," and "possibly banging on her door." Davis photographed the Buick Appellant was driving, including the license plate, and provided the photographs to police. On November 14, one of the city's license plate recognition cameras captured the Buick driving into Snyder. While on patrol, Officer Rackley received an automatic alert[3] with the photograph of the Buick and forwarded the Buick's last known location to Officer Silva. Officer Silva saw the Buick in a gas station parking lot, and recognized Appellant as the driver. Although Appellant was wearing a face mask and sunglasses when officers approached the Buick, Appellant's face was uncovered when Officer Silva saw him at the gas station. Officer Silva followed Appellant, and initiated the traffic stop when Appellant turned into the alley.

Based on the totality of the circumstances, and affording appropriate deference to the trial court's implicit credibility determinations, as we must, we conclude that Officer Rackley and Officer Silva articulated sufficient, specific facts that constituted reasonable suspicion to support the basis for the traffic stop. *See Espinosa*, 666 S.W.3d at 667; *Jaganathan v. State*, 479 S.W.3d 244, 247 (Tex. Crim.

---

[2]Officer Rackley explained that law enforcement may not forcefully enter a home to execute an arrest warrant for a misdemeanor offense, but may do so under certain circumstances to execute a felony arrest warrant. *See* CRIM. PROC. art. 15.25 ("In [the] case of [a] felony, the officer may break down the door . . . for the purpose of making an arrest . . . ."); *Steagald v. United States*, 451 U.S. 204, 211 (1981).

[3]The previous day, Officer Rackley created a custom alert through the city's "Flock Safety" system of license plate recognition cameras to be notified by text message if any cameras captured the Buick driving inside the city limits.

App. 2015). Officer Silva plainly recognized Appellant, and the officers' collective knowledge of Appellant's outstanding warrant provided, at the very least, reasonable suspicion to detain and investigate Appellant. *See Haley v. State*, 480 S.W.2d 644, 645 (Tex. Crim. App. 1972) (stating that probable cause "clearly existed" for an arrest when the warrant check revealed outstanding warrants); *Brooks v. State*, 76 S.W.3d 426, 434 (Tex. App.—Houston [14th Dist.] 2002, no pet.) ("[T]he fact that appellant had several outstanding warrants gave the officers probable cause to arrest him."). Given the objectively justifiable basis for the initial detention, the traffic stop did not violate Appellant's Fourth Amendment protection against unreasonable seizures. *See Derichsweiler*, 348 S.W.3d at 914. Consequently, the trial court did not abuse its discretion when it denied Appellant's motion to suppress.

We overrule Appellant's third issue.

### IV. *Appellant's Competency to Stand Trial*

In his first issue, Appellant asserts that the trial court abused its discretion when it found that he was competent to stand trial without holding a formal competency hearing. He points to his "bizarre acts" and his inability "to set aside sovereign-citizen-esque fixations and focus on facts and events" as evidence that he was incompetent to stand trial.[4]

### A. *Standard of Review and Applicable Law*

"[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *McDaniel v. State*, 98 S.W.3d 704, 709 (Tex. Crim. App. 2003) (quoting *Drope v.*

---

[4]Appellant contends that "his current medication regime while being housed at Bill Clements Unit" shows that he "suffers from mental health issues." This assertion is wholly unsubstantiated by the record and has no bearing on Appellant's mental competency at the time of trial.

*Missouri*, 420 U.S. 162, 171 (1975)). Convicting a defendant who is legally incompetent violates due process of law. *Id.*

A defendant is presumed to be competent to stand trial and shall be found competent to stand trial unless it is otherwise proved by a preponderance of the evidence that he is incompetent. CRIM. PROC. art. 46B.003(b) (West 2018). "A person is incompetent to stand trial if the person does not have: (1) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against the person." *Id.* art. 46B.003(a). This standard aims to safeguard the accuracy and reliability of the trial, enhance fairness of the criminal process, maintain the dignity of the trial process, and make punishment more just. *Morris v. State*, 301 S.W.3d 281, 286 n.9 (Tex. Crim. App. 2009) (discussing the rationale for the competency standard articulated in *Dusky v. United States*, 362 U.S. 402 (1960)). "Competence to stand trial is rudimentary," and the "rights deemed essential to a fair trial"—the right to effective assistance of counsel, to summon, confront, and cross-examine witnesses, and to testify on one's own behalf or remain silent—depend on it. *Id.* at 287 (quoting *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996)).

A trial court employs a two-step procedure for making competency determinations: (1) an informal inquiry; and (2) a formal competency trial. *Boyett v. State*, 545 S.W.3d 556, 563 (Tex. Crim. App. 2018). The trial court must conduct an informal inquiry upon any "suggestion" from any credible source that the defendant may be incompetent. *Id.*; *see* CRIM. PROC. art. 46B.004(a), (c), (c-1). If the trial court determines at the informal inquiry stage that there is "some evidence from any source that would support a finding that the defendant may be incompetent to stand trial," it must then proceed to the second step—order that the defendant submit to a psychiatric or psychological competency examination and, except for

certain exceptions, later hold a formal competency trial. *Boyett*, 545 S.W.3d at 563 (quoting CRIM. PROC. art. 46B.004(c) then citing CRIM. PROC. arts. 46B.005(a), (b), 46B.021(b)).

The "some evidence" standard at the informal inquiry stage "requir[es] 'more than none or a scintilla' of evidence that 'rationally may lead to a conclusion of incompetency.'" *Boyett*, 545 S.W.3d at 564 (quoting *Turner v. State*, 422 S.W.3d 676, 692 (Tex. Crim. App. 2013)). There must be some evidence presented from which it may rationally be inferred that: (1) the defendant suffers some degree of a debilitating mental illness; (2) he obstinately refuses to cooperate with trial counsel to his own apparent detriment; and (3) his mental illness is what fuels his obstinacy. *Id.*; *Turner*, 422 S.W.3d at 696. In other words, "it is not enough to present evidence of either a defendant's mental illness alone or his refusal to cooperate with counsel— rather, there must be some evidence indicating that the defendant's refusal to rationally engage with counsel is caused by his mental illness." *Boyett*, 545 S.W.3d at 564.

> Evidence relevant to these issues includes whether a defendant can: (1) rationally understand the charges against [him] and the potential consequences of the pending criminal proceedings; (2) disclose to counsel pertinent facts, events, and states of mind; (3) engage in a reasoned choice of legal strategies and options; (4) understand the adversarial nature of criminal proceedings; (5) exhibit appropriate courtroom behavior; and (6) testify.

*Morris*, 301 S.W.3d at 286 (quoting CRIM. PROC. art. 46B.024); *see* CRIM. PROC. arts. 46B.004(c-1).

The trial court is not required to follow any specific protocols in conducting the informal inquiry. *George v. State*, 446 S.W.3d 490, 501 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd); *Duhamel v. State*, No. 11-22-00192-CR, 2024 WL 2751285, at *7 (Tex. App.—Eastland May 30, 2024, no pet.) (mem. op., not

designated for publication). During its informal inquiry, the trial court, in making this initial determination, "must consider only evidence of incompetency, and it must not weigh evidence of competency against the evidence of incompetency." *Boyett*, 545 S.W.3d at 564. "[T]he trial court's first-hand factual assessment of [a defendant's] mental competency," based on its observations of the defendant's mannerisms and behaviors, is "entitled to great deference." *McDaniel*, 98 S.W.3d at 713; *Duhamel*, 2024 WL 2751285, at *7. We therefore review challenges to the adequacy of a trial court's competency inquiry and its competency determination for an abuse of discretion. *Montoya v. State*, 291 S.W.3d 420, 426 (Tex. Crim. App. 2009), *superseded by statute*, CRIM. PROC. art. 46B.004, *as recognized in Turner*, 422 S.W.3d at 692 & n.31 (explaining that the former "*bona fide* doubt standard" is no longer used to determine competency); *Luna v. State*, 268 S.W.3d 594, 600 (Tex. Crim. App. 2008); *see also Clark v. State*, 592 S.W.3d 919, 925 (Tex. App.— Texarkana 2019, pet. ref'd).

We may not substitute our judgment for that of the trial court, and we must uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Burch v. State*, 541 S.W.3d 816, 820 (Tex. Crim. App. 2017). A trial court does not abuse its discretion absent a showing that it acted arbitrarily or unreasonably, or without reference to any guiding rules and principles. *State v. Lerma*, 639 S.W.3d 63, 68 (Tex. Crim. App. 2021). An abuse of discretion occurs "only when no reasonable view of the record could support" the trial court's ruling. *Id.*

B. *Sovereign Citizens' Philosophy and Competency to Stand Trial*

Appellant's rhetoric throughout the proceedings is a familiar script frequently espoused by "so-called 'sovereign citizens' who have plagued courtrooms across the country." *Jemerson v. State*, No. 02-23-00036-CR, 2023 WL 6889947, at *5 n.6 (Tex. App.—Fort Worth Oct. 19, 2023, pet. ref'd) (mem. op., not designated for

publication) (collecting cases); *see also Lewis v. State*, 532 S.W.3d 423, 430–31 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd). This old tune that is comprised of inaccurate case law quotes, self-serving readings and interpretations of the United States Constitution, and proffered definitions from outdated legal dictionaries has been summarily rejected by federal and state courts alike.[5] Courts have further acknowledged that although sovereign citizens' particular brand of obstinacy may arguably promote an initial suggestion of incompetency, they "typically have the capacity to understand criminal proceedings and assist an attorney." George F. Parker, *Competence to Stand Trial Evaluations of Sovereign Citizens: A Case Series and Primer of Odd Political and Legal Beliefs*, 42 J. AM. ACAD. PSYCH. & LAW 338, 344 (2014)[6]; *see also*, *e.g.*, *Lewis*, 532 S.W.3d at 430–31. With this issue now before us, we likewise conclude that simply espousing or promoting sovereign-citizen beliefs neither suggests nor indicates that one is incompetent to stand trial. A cursory examination of the movement's foundational tenets reveals a clear, calculated purpose behind the obstructive, chaotic behavior of those that subscribe to it.

---

[5]*See, e.g.*, *United States v. Coleman*, 871 F.3d 470, 476 (6th Cir. 2017); *United States v. Neal*, 776 F.3d 645, 657 (9th Cir. 2015) (Defendant's sovereign-citizen beliefs and "numerous comments . . . disputing jurisdiction and other 'nonsensical' issues such as calling the United States a corporation" did not display a lack of competency); *United States v. James*, 328 F.3d 953, 954–56 (7th Cir. 2003) (A disruptive defendant claiming to be a Moorish national, "copyrighted" his name, and sent invoices to government officials who used his name did not warrant a competency hearing); *Jemerson*, 2023 WL 6889947, at *5 n.6; *Ochoa v. State*, No. 07-16-00400-CR, 2018 WL 1278714, at *4–5 (Tex. App.—Amarillo Mar. 12, 2018, no pet.) (mem. op., not designated for publication) (Defendant's "repeated diatribes about trusts, admiralty jurisdiction, military jurisdiction, the Uniform Commercial Code, fiduciaries, and the like," albeit bizarre, does not "fall into the category the Court of Criminal Appeals mentioned in *McDaniel*."); *Lewis*, 532 S.W.3d at 430–31; *see also Anderson v. Johnson*, 554 P.3d 205 (Nev. 2024) (unpublished disposition), No. 87098, 2024 WL 3841586, at *2 (Sovereign citizen beliefs "do not establish a lack of competence to stand trial"); *People v. Williams*, 189 A.D.3d 1978, 1981 [3rd Dept. 2020] ("[T]he record reflects that [the] defendant selectively exhibited behavior associated with adherents of the sovereign citizen's movement," rather than evidence of incompetency); *State v. Thomas*, 1st Dist. Hamilton No. C-170400, 2019-Ohio-132, 2019 WL 258699, at *3 (Sovereign-citizen beliefs or other "fringe views" alone do not trigger the need for a competency evaluation.).

[6]*Available at* https://jaapl.org/content/jaapl/42/3/338.full.pdf.

Though the precise contours of the philosophy differ among various groups, sovereign citizens believe they are beyond the reach of the government's jurisdiction. *See United States v. Jones*, 65 F.4th 926, 928 (7th Cir. 2023); *United States v. Jonassen*, 759 F.3d 653, 657 n.2 (7th Cir. 2014) ("Sovereign citizens' assert that the federal government is illegitimate and insist that they are not subject to its jurisdiction. The defense has 'no conceivable validity in American law.'" (quoting *United States v. Schneider*, 910 F.2d 1569, 1570 (7th Cir. 1990))). They openly renounce the legitimacy of the United States government and criminal justice system by relying on curious and implausible interpretations of legal documents such as the United States Constitution and the Fourteenth Amendment. *See* Cheryl M. Paradis, Elizabeth Owen & Gene McCullough, *Evaluations of Urban Sovereign Citizens' Competency to Stand Trial*, 46 J. AM. ACAD. PSYCH. & LAW 158, 159 (2018)[7]; Parker, *supra* at 343–46.

Importantly, the ideology's inherent opposition to authority and subversion of the legal process belies post-conviction assertions of incompetency. Sovereign-citizen rhetoric portrays an awareness of the law, one's constitutional rights, and a broad understanding of the criminal justice system, while in concert with conscious disobedience. For instance, they claim that names written in all capital letters do not refer to "the 'flesh and blood' or [a] 'natural' person," and that they are unburdened by certain responsibilities such as securing a driver's license or paying taxes, yet they have the "inalienable or 'God given' right to travel." *See* Paradis et.al., *supra* at 159. Further, various groups have designed boilerplate legal templates that are available online that use "impressive-sounding tomes" and "trappings of legitimacy to maintain ignorance of mainstream legal interpretations and defend pseudolegal

---

[7]*Available at* https://jaapl.org/content/jaapl/46/2/158.full.pdf.

ideas."   Colin McRoberts, *Tinfoil Hats and Powdered Wigs: Thoughts on Pseudolaw*, 58 WASHBURN L.J. 637, 653 (2019).

Although their misinformed legal theories are rooted in an incomplete familiarity with isolated principles that are stripped of their intended meaning, they nevertheless grasp the nature of legal proceedings, and then knowingly defy it. *See id.* at 653 (It "requires an almost aggressive ignorance of the relevant facts" to call income tax and requiring drivers to be licensed unconstitutional.); *see also* Caesar Kalinowski IV, *A Legal Response to the Sovereign Citizen Movement*, 80 MON. L. REV. 153, 158–171 (2019) (explaining the origins of the movement and citing sovereign citizen websites quoting the United States Constitution and Supreme Court cases).  Simply put, sovereign citizens attempt to play the fool with a hidden hand—they are defiant by design, which necessarily entails having a rational understanding of legal proceedings.

C.  *Appellant's Competency to Stand Trial*

In light of the foregoing, Appellant's argument that his "sovereign-citizen-esque fixations" is suggestive of his lack of competency to stand trial is unavailing. He fervently protested throughout the proceedings that he only understood "universal law and natural law," "common law," and the Uniform Commercial Code.  According to Appellant, he was "not a U.S. citizen or a federal citizen . . . only an inhabitant of Texas."  And because he is "a secured party creditor and not a secured party debtor," the State of Texas as a government was "committing a trespass against [him]."  The trial court expressly determined that Appellant was mentally competent to stand trial after thoroughly inquiring and admonishing him of the risks of self-representation and his choice to represent himself at trial.

Despite Appellant's confrontational, disruptive behavior and misguided legal ramblings which has no application in a courtroom in Texas or elsewhere, his

conduct does not suggest that such a purported disconnect from reality would equate to mental incompetence. *See Lindsey v, State*, 544 S.W.3d 14, 25 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd) ("Appellant's lack of courtroom etiquette does not equate to mental incompetence."). Bizarre legal theories and unusual beliefs—whether sincerely held or intentionally advanced to disrupt legal proceedings—are a far cry from any indicia of incompetency. *See James*, 328 F.3d at 954–56; *see also Ochoa*, 2018 WL 1278714, at *4–5 (the defendant's "repeated diatribes about trusts, admiralty jurisdiction, military jurisdiction, the Uniform Commercial Code, fiduciaries, and the like," albeit bizarre, did not require an informal inquiry into his competency). As such, Appellant's selective adoption of a typical sovereign-citizen stance is hardly akin to being incompetent to stand trial.

Utilizing another sovereign-citizen tactic, Appellant claimed that he "[did] not understand any [of the] charges [pending against him]." The refusal to cooperate, rationally engage, or profess confusion and a lack of understanding is not enough to demonstrate incompetency to stand trial, if it is evident that the defendant understood the adversarial nature of the proceedings and was able to meaningfully participate. *See Boyett*, 545 S.W.3d at 564; *Clark*, 592 S.W.3d at 928; *see also Alhadad v. State*, No. 02-22-00201-CR, 2023 WL 4940621, at *1–2, 11 (Tex. App.—Fort Worth Aug. 3, 2023, pet. ref'd) (mem. op., not designated for publication) (upholding the trial court's competency determination despite the defendant's erratic and disruptive courtroom behavior, and professed lack of understanding of the pending charges). Here, we conclude that the trial court rationally determined that Appellant's obstinacy was a legal tactic fueled by his belief in sovereign-citizen ideology, not by any genuine or legitimate mental illness or disability for which there is no evidence.

Appellant further asserts that "[i]t is clear from reading the dry record . . . that [he] suffers from mental health issues," based on the following actions: (1) his

inability to differentiate between the prosecutor and his standby counsel; (2) referring to the jurors as "witnesses"; (3) accusing the trial judge of "practicing law"; and (4) because he "lodged an objection based on 'conspiracy.'" To the contrary, the record shows quite the opposite—throughout the trial, Appellant manifested a clear grasp and understanding of the allegations, the adversarial nature of the proceedings, and the ability to mount a defense to the charges.

Appellant, who is no stranger to the criminal justice system, brazenly informed the trial court: "I don't have to follow the rules." To further illustrate, amidst a contentious exchange during a pretrial hearing, Appellant candidly revealed his knowledge and experience of trial proceedings to the trial court:

> Since you're speaking about trial, I doubt it will be possible for somebody to produce a jury of my peers, because all jurors are selected from pools of registered voters. And when people register to vote their natural ability to talk in natural law is diminished and they become fiction, so they are definitely not my peers.

*See* TEX. GOV'T CODE ANN. § 62.001(a)(1) (West Supp. 2024) (requiring that prospective jurors be summoned from voter registration lists). During jury selection, Appellant showed proper deference to the venire panel by ultimately following the trial court's directive to stand while addressing the prospective jurors. At trial, Appellant contested the State's redactions of Officer Rackley's bodycam footage, and argued that the "witnesses"—the jury—"should definitely hear why it was edited." It is therefore clear that Appellant aptly understood and distinguished the jury's role as the factfinder from the parties' opportunity to present evidence through witnesses. He simply misspoke when he referred to the jury as "witnesses."

Appellant's purported inability to distinguish his standby counsel from the prosecutor is also unsubstantiated by the record. Appellant conferred with Jones and

24

asserted numerous objections throughout the State's case-in-chief. For instance, Appellant erupted during the State's voir dire presentation:

> [APPELLANT]: I don't have to stand by and watch British ministerial persecuting me any further [referring to the prosecutor].

> [TRIAL COURT]: It appears to me that you are merely attempting to disrupt, delay, cause any kind of trouble that you can.

> [APPELLANT]: Well, he's trying to fatigue the crowd before I get a chance to talk. They want to ask me questions but he's steadily talking.

> [TRIAL COURT]: This is how voir dire works, Mr. Royal.

Then, acknowledging the trial court's authority, and perhaps realizing the benefit of rational communication, Appellant asked: "Can you make him speed up or something?" Consequently, Appellant was cognizant of the respective roles of the prosecutor, Jones, and the trial court.

Finally, Appellant's objections based on an alleged conspiracy and accusing the trial court of practicing law are inapposite, and do not vitiate his comprehension of the proceedings. Making irrelevant statements and attempting to inject inadmissible evidence do not evince a lack of understanding, or an inability to communicate or function rationally. *See, e.g.*, *Lindsey*, 544 S.W.3d at 24 ("Lack of legal skill or mediocre legal strategy does not show a defendant is incompetent to stand trial."). Further, Appellant's deliberate opposition to "giv[ing] [the trial court] recognition as authority" demonstrates his awareness of the trial court's role. As such, Appellant's ramblings and bizarre behavior, "while imperfect and rude, at times, did not suggest incompetency." *Id.*; *Lewis*, 532 S.W.3d at 429–433 (the trial court did not abuse its discretion by not conducting an informal inquiry despite the sovereign-citizen defendant's obstructive behavior and professed lack of understanding of relevant legal rules).

We cannot ignore the trial court's first-hand factual assessment of Appellant's demeanor and mental competence, and we afford the trial court's findings the deference to which they are entitled. *See McDaniel*, 98 S.W.3d at 713. Guided by its observations, the trial court, after thoroughly examining and admonishing Appellant, correctly and rationally determined that Appellant (1) had an adequate understanding of the charges pending against him, the parties' roles, and the nature of the proceedings, and (2) could adequately confer with standby counsel (Jones), decide whether to testify on his own behalf, and maintain appropriate decorum when he chose to do so. Further, he unequivocally advised the trial court, in response to its inquiry, that he was mentally competent and did not have any mental disability or illness. No evidence to the contrary was presented.

Accordingly, we overrule Appellant's first issue.

## V. *The Right to Self-Representation*

Appellant contends in his second issue that the trial court erroneously granted his timely and unequivocal request to invoke his right to self-representation. Relying on the same facts to support his contention that he was not competent to stand trial, he also argues that he lacked the competence to knowingly, intelligently, and voluntarily waive his right to counsel and invoke his right to self-representation for purposes of trial. However, we reiterate that the trial court did not abuse its discretion when it granted Appellant's request.

### A. *Standard of Review & Applicable Law*

Every criminal defendant has the constitutional right to the assistance of counsel and the reciprocal constitutional right to self-representation. U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. The right to self-representation is separate from the right to assistance of counsel, and to choose one is to forego the other. *Osorio-Lopez v. State*, 663 S.W.3d 750, 756 (Tex. Crim. App. 2022) (citing *United States v.*

*Purnett*, 910 F.2d 51, 54 (2nd Cir. 1990)). But, to proceed pro se, a defendant must knowingly, intelligently, and voluntarily waive his right to counsel, and clearly and unequivocally assert his right to self-representation. *Id.* (citing *Faretta v. California*, 422 U.S. 806, 835 (1975)).

A knowing and intelligent waiver requires a showing that the defendant was warned of the "dangers and disadvantages of self-representation," and "his choice [was] made with eyes open." *Faretta*, 422 U.S. at 835); *Osorio-Lopez*, 663 S.W.3d at 756. Whether the waiver of the right to assistance of counsel was effective depends on the totality of the circumstances, including the consideration of a defendant's background, experience, and conduct. *Osorio-Lopez*, 663 S.W.3d at 756. However, inquiries concerning a defendant's age, education, background, or previous mental health history are not mandatory in every instance. *Blankenship v. State*, 673 S.W.2d 578, 583 (Tex. Crim. App. 1984).

A defendant must be competent to choose and invoke his right to self-representation before he can knowingly and intelligently waive his right to the assistance of counsel and represent himself. *Osorio-Lopez*, 663 S.W.3d at 757 (citing *Godinez v. Moran*, 509 U.S. 389, 399–400 (1993)). The competency to effectively waive the right to counsel is the same as the standard for determining one's competency to stand trial, which requires a defendant to have: (1) the "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding"; and (2) "a rational as well as factual understanding of the proceedings against him." *Chadwick v. State*, 309 S.W.3d 558, 560 (Tex. Crim. App. 2010); *see also Indiana v. Edwards*, 554 U.S. 164, 170 (2008). "[A] defendant need not have the skill and experience of a lawyer 'to competently and intelligently choose self-representation.'" *Osorio-Lopez*, 663 S.W.3d at 757 (quoting *Faretta*, 422 U.S. at 835). In this regard, the focus is not whether the defendant is competent

to represent himself at trial; rather, it is whether he is competent to effectively *choose* to do so. *Id.* (citing *Godinez*, 509 U.S. at 400–01).

The trial court is in the best position to determine if the defendant is competent to proceed pro se. *See Chadwick*, 309 S.W.3d at 562–63. We thus review the trial court's ruling on the defendant's request for an abuse of discretion. *Id.* at 563. Because one's competency to choose self-representation is a mixed question of law and fact that turns on an evaluation of credibility and demeanor, we afford almost total deference to the trial court's ruling. *Id.* at 561. In doing so, we view the evidence in the light most favorable to the trial court's ruling and imply any findings of fact that are necessary to support its ruling, provided they are supported by the record. *Id.*

B. *Appellant's Competency to Voluntarily Choose Self-Representation*

A criminal defendant's ability to competently choose self-representation and to stand trial are distinct, yet related, inquiries. *Edwards*, 554 U.S. at 174–75, 178. Here, Appellant reasserts that his "fixations and delusions," his lack of respect and courtroom decorum, and his general inability "to conduct himself with the usual decorum required in court" or "express his thoughts and arguments in a concise and orderly fashion," undermined the trial court's conclusion that he competently chose to represent himself.

Once again, Appellant's argument is neither novel, meritorious, nor persuasive. *See, e.g.*, *Jonassen*, 759 F.3d at 660–61 & n.4 (concluding that a sovereign citizen was competent to stand trial and, by extension, able to represent himself). As with Appellant's proclaimed confusion, his assertion of his right to self-representation and simultaneous deflection during his admonishment exchange with the trial court were part and parcel of his sovereign-citizen defense. *See Jones*, 65 F.4th at 930–31 (The appellant argued "that his legal theories were so outlandish

28

. . . that he could not have knowingly and voluntarily waived his right to counsel. Not so, in our view."). Pursuing that defense placed the trial court in a delicate position, because the trial court has limited discretion to deny a defendant's request to invoke his right of self-representation. *See Lewis*, 532 S.W.3d at 430–31.

While a defendant may not use his rights "to manipulate the court" or "jack the system around," *Huggins v. State*, 674 S.W.3d 538, 549 (Tex. Crim. App. 2023), he "must be allowed to represent himself 'if he truly wants to do so.'" *Blankenship*, 673 S.W.2d at 584 (quoting *Faretta*, 422 U.S. at 817). This is so because, "[d]espite [a] trial judge's benevolent intentions,"

> [T]he right to defend is personal. It is the defendant, *not* his lawyer or the State, who will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. While we may be skeptical of his election knowing that he may conduct his defense ultimately to his own detriment, his choice must be honored.

*Blankenship*, 673 S.W.2d at 583; *O'Brien v. State*, 482 S.W.3d 593, 623 (Tex. App.—Houston [1st Dist.] 2015), *aff'd*, 544 S.W.3d 376 (Tex. Crim. App. 2018).

Here, Appellant unequivocally asserted his right of self-representation, and persisted in his request even after the trial court patiently and properly admonished him as to the perils and pitfalls of proceeding pro se. *See Burgess v. State*, 816 S.W.2d 424, 429 (Tex. Crim. App. 1991). Appellant therefore made "a clear-eyed, tactical decision" by choosing to defend himself at trial, and "the trial court had no alternative but to respect [Appellant's] right." *Jones*, 65 F.4th at 930; *Burgess*, 816 S.W.2d at 429; *see also McKaskle v. Wiggins*, 465 U.S. 168, 177 (1984) (The denial of the right of self-representation "is not amenable to 'harmless error' analysis. The right is either respected or denied; its deprivation cannot be harmless.").

Moreover, Appellant was deliberately recalcitrant in response to the trial court's inquiries, refusing to divulge his age, education, and courtroom experience.

We reiterate, however, that Appellant's ongoing disruptive conduct was no indication that he was incompetent to waive his right to counsel and exercise his right to represent himself. *See Moore v. State*, 999 S.W.2d 385, 395 (Tex. Crim. App. 1999). "If such actions were probative of incompetence, one could effectively avoid criminal justice through immature behavior." *Id.* at 395.

Even so, by submitting several handwritten, pretrial, pro se motions, Appellant made clear his literacy and general understanding of applicable legal principles. Furthermore, his arguments, objections, and even his outbursts during trial were "timely, topical, and logically related to the questions and answers offered during the examination of other witnesses." *Id.* Appellant cross-examined witnesses, objected to evidence offered by the State, and presented witnesses in his defense. While he may not have handled the stages of trial with the skill and finesse of a seasoned trial attorney, his "[l]ack of legal skill or mediocre legal strategy" is no indicia of incompetency. *See Lindsey*, 544 S.W.3d at 24; *Demarsh v. State*, No. 02-15-00210-CR, 2016 WL 1267702, at *6 (Tex. App.—Fort Worth Mar. 31, 2016, no pet.) (mem. op., not designated for publication). Nor does a defendant's ill-informed legal strategy imply mental incompetence. *See Jones*, 65 F.4th at 930–31; *Lindsey*, 544 S.W.3d at 24.

Appellant's sovereign-citizen beliefs, however unwise, are not evidence that he was incompetent to knowingly and voluntarily waive his right to counsel and invoke his right to proceed pro se. He made conscious, strategic decisions, was capable of rational communication, and irrefutably appreciated the adversarial nature of the proceedings and the charges filed against him. *See Lindsey*, 544 S.W.3d at 26. We find nothing unfair in holding Appellant to his choice, as "the Sixth Amendment protects the right of defendants to 'go down in flames'" if they so

choose. *Jones*, 65 F.4th at 930–31 (quoting *United States v. Reed*, 668 F.3d 978, 986 (8th Cir. 2012)).

In this instance, Appellant's behavior supports, rather than undermines as he suggests, the trial court's determination that Appellant was competent to waive his right to counsel and to proceed pro se. Accordingly, we conclude that the trial court did not abuse its discretion by granting Appellant's request to represent himself.

We overrule Appellant's second issue.

### VI. *Clerical Errors in the Judgments of Conviction*

In his fifth and sixth issues, Appellant correctly points out that court costs are erroneously assessed in both judgments, and the Penal Code provision recited in one judgment does not correspond to the offense for which he was convicted.

Pursuant to Article 102.073(a) of the Code of Criminal Procedure, court costs may only be assessed once against a defendant who is convicted of multiple offenses in a single criminal action. CRIM. PROC. art. 102.073(a). Here, Appellant was convicted of two separate offenses in a single criminal action, yet each judgment orders Appellant to pay court costs of $290. Consequently, court costs were erroneously assessed in one of these causes. *See id.* art. 102.073(a).

An appellate court has the power to modify the trial court's judgment to make it speak the truth when it has the necessary information before it to do so. *See* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993). Court costs are determined by "using the highest category of offense that is possible based on the defendant's convictions." CRIM. PROC. art. 102.073(b). Because the offense with the highest category for which Appellant was convicted is the offense of aggravated assault against a public servant, a first-degree felony, we retain the court costs assessed in that judgment (trial court cause no. 11110), and we modify the trial court's judgment and delete the $290 court costs assessment ordered

in trial court cause no. 11108 (the offense of evading arrest or detention with a vehicle). *See id.* art. 102.073(b).

Additionally, the judgment of conviction in trial court cause no. 11108 recites that Appellant was convicted under Penal Code Section 38.04(b)(1)(B); this is the incorrect statute of conviction. Section 38.04(b)(2)(A) criminalizes using a vehicle to evade arrest or detention. *See* PENAL § 38.04(b)(2)(A). Because we again have the necessary information to make the judgment speak the truth, we modify the judgment of conviction in trial court cause no. 11108 to recite the correct statute of conviction, Penal Code Section 38.04(b)(2)(A). *See* TEX. R. APP. P. 43.2(b); *Bigley*, 865 S.W.2d at 27–28.

We sustain Appellant's fifth and sixth issues, and we modify the trial court's judgment in trial cause no. 11108 as set forth above.

## VII. *This Court's Ruling*

We affirm the judgments of the trial court as modified.



W. STACY TROTTER

JUSTICE


December 12, 2024

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.